JOSEPH WILSON and others *v.* THE BOARD OF ALDERMEN OF
THE CITY OF CHARLOTTE.

The Board of Aldermen of the City of Charlotte, under the amendments
to the charter of said city, passed by the General Assembly the 25th
of January, 1872, has the power to levy an *ad valorem* tax on the bonds,
solvent credits and stock in incorporated companies held and owned
by the resident citizens of said city, and also to tax their several in-
comes.

Said Board of Aldermen is not prohibited by sec. 7, Art. IV, of the
Constitution, from levying a tax on the taxable property of the city,
without submitting the same to the qualified voters of said city, for
the purpose of paying the necessary expenses of the city government,
and paying the interest on certain bonds heretofore issued to pay such
necessary expenses. Nor do secs. 24 and 25 of the charter of said
city prohibit the levying such tax.

(*Broadnax* v. *Groom,* 64 N. C. Rep 244; *Mitchell* v. *School Committee,*
71 N. C. Rep. 400; *Pullen* v. *Commissioners of Raleigh,* 68 N. C. Rep.
451; *Lilly* v. *Commissioners of Cumberland,* 69 N. C. Rep. 300; *Pippen*
v. *Ellison,* 12 Ired. 61, cited and approved.)

BYNUM, J. *dissenting.*)

This was a CONTROVERSY, submitted without action, to his
Honor Judge *Schenck,* at the Spring Term, 1875, of the Su-
perior Court of MECKLENBURG county, and determined upon
the following facts :

Certain persons, citizens and residents of the city of Char-
lotte, who are tax payers, being advised that they are not
subject to be taxed on account of debts and securities for
money held by them, and lately demanded for the year 1875,
having proposed to the Board of Aldermen of said city to
submit the matter in controversy, without action, upon a case
agreed—the said Joseph H. Wilson representing himself and
other citizens of said city, from whom the said tax has been
demanded, on the one part, and the Board of Aldermen of
the city of Charlotte, on the other part, submit the contro-
versy on the following statement of facts.

I. The Board of Aldermen of the city of Charlotte, in the early part of the year, 1874, passed an ordinance levying taxes for city purposes, for the said year, 1874. That by the 6th section of said ordinance, it is enacted as follows:

" There shall be an *ad valorem* tax of seventy-five (75) cents on one hundred (100) dollars of the assessed valuation of all real and personal property within the city ; and the like tax upon the real value of all bonds, stock or other investments in banks, National, State or private, railroads and other incorporated companies ; and a like tax on cash on hand or deposit, and on solvent credits, *provided*, however, that he or they may deduct from the amount of debts owing to him, the amount owing to him, and the residue only shall be liable to taxation."

" Section 17th. There shall be a tax of one dollar upon every one hundred dollars, upon the amount of net income derived from all sources, not hereinbefore taxed. The net income shall be estimated, by deducting from the gross income, 1st, taxes; 2d, rent for the use of buildings or other property, or interest on incumbrances on property, and in the business from which the income is derived; 3d, usual or ordinary repairs of the building, from which the income is derived; 4th, cost or value of the labor, (except that of the tax-payer himself,) raw material, food, and any other necessary expense incident to the business, from which the income is derived, together with the necessary expenses of supporting the family, which shall, in no instance, exceed one thousand dollars."

" Section 8th. In addition to the taxes above levied, there shall be a specific tax of one quarter of one *per cent.*, ($\frac{1}{4}$) on all real and personal property, as described in the preceding section, for the purpose of paying the interest on the bonds of the city, and to constitute a Sinking Fund, in pursuance of sec. 26, charter of the city of Charlotte."

That said Wilson and others have paid the taxes assessed by said city upon their property, with the exception of that

assessed upon their solvent credits, stocks and money on hand.

II. That by the terms of the last mentioned ordinance, the tax-payers of the city were required to make returns, on oath, to the city Clerk and Treasurer of all property, and other subjects of taxation embraced within the provisions of the said ordinance, and owned by the said tax-payers respectively, on the 1st day of February, 1874; and of their respective incomes received by them during the fiscal year immediately preceding the said 1st day of February, 1874, which said return was required to be made within thirty days after the 1st day of June, 1874.

III. That on the said 1st day of February, 1874, the said Joseph H. Wilson owned solvent credits to the amount of thirty-eight thousand eight hundred and seventy-five dollars, and bank stock to the amount of nine thousand dollars. That his net income for said fiscal year, was six hundred and fifteen dollars ($615).

IV. That the debt of the city of Charlotte is about forty-five thousand (45,000) dollars, twenty-five thousand of which is admitted to be legal, consisting of bonds issued by said city, in conformity to law. That in addition thereto, said city has contracted other debts, which have gradually increased from year to year, from the adoption of the present Constitution, to the year 1874, amounting to twenty-four thousand (24,000) dollars, consisting of three thousand nine hundred and thirty-two (3,932) dollars, due by notes to the different banks of the city of Charlotte, for money borrowed and expended in defraying the necessary expenses of the city government; also six thousand two hundred and eighty-eight (6,288) dollars, due to different persons, upon notes given to them, for damages to real estate, arising from widening the streets of the city, which last mentioned notes contain a stipulation, that they are to be paid by giving the holders credit on their respective notes for the amount of their taxes, year, by year, until said notes are

paid.   That by this means, a considerable portion of said notes has been paid.   That the balance of said indebtedness consists of accounts for work done, or for materials furnished for improving the streets, and other expenses of the government deemed necessary.   That this indebtedness was incurred without a popular vote of the citizens ; and that after its contraction, to wit, in November, 1873, a proposition was submitted by the Board of Aldermen of said city, to the citizens thereof, to clothe said Board of Aldermen, by a popular vote, with authority to fund said debt, which was refused and the proposition voted down.

That the tax in question is levied to pay off the interest on the bank debt ; to pay the current expenses of the city government, and to pay off the twenty-four thousand (24,000) dollar debt, contracted as aforesaid, as far as it will go.

V. That the said Joseph H. Wilson, and those interested with him, being of opinion that said solvent credits, bank stock and income were not subject to taxation by said Board of Aldermen of said city of Charlotte, refused to make return thereof ; and after the time had elapsed, within which taxpayers were required to make return of their taxable property and other subjects of taxation, the said Board of Aldermen ordered the Clerk and Treasurer of the city to complete the tax list by reference to the returns for the State and county taxes.   That this was accordingly done, and the said Joseph H. Wilson was assessed on the said solvent credits, bank stock and income, the sum of three hundred and sixty-five dollars and twenty-one cents, (365.21,) which sum was duly demanded of him, and payment thereof refused.

The charter of the city of Charlotte, with the amendments thereto, and the ordinances for raising revenue, as hereinbefore set out, is made a part of the case agreed, but which it is unnecessary farther to notice.

If the court should be of opinion, that the said solvent credits, bank stocks and incomes are subjects of taxation by

the Board of Aldermen of the said city of Charlotte, and the tax thus levied by said Board of Aldermen is legal, then judgment is to be rendered for the said Board. If, on the other hand, the court should be of opinion, that said property is not the subject of taxation by said Board of Aldermen, and that the tax thus levied is illegal, the judgment is to be entered for the plaintiff.

His Honor, being of opinion with the defendant, rendered judgment as follows, to wit:

The facts of this case are agreed, and raise two questions:

*First.* Whether or not the city of Charlotte, under the charter as present amended, has power to levy a tax upon all the property mentioned in Art. V, sec. 3, of the Constitution, including solvent credits, bond, &c., &c. This depends upon the construction of sec. 2 of the amendment to the charter, dated 25th of January, 1872, which reads as follows:

"That said tax shall be levied on all real and personal property, trades, licences and *other subjects of taxation*, as provided in sec. 3 of Art. V of the State Constitution." For the power of city authorities to tax debts and securities for money, depends upon the charter. *Pullen* v. *Commissioners of Raleigh*, 68 N. C. Rep., 451. On this point, the court is of opinion, that " other subjects of taxation," means all property subject to taxation, and that the word " provided " refers to the rules governing the taxation; that is, it must be "uniform " as to credits, &c., and according to its true value, as to real and personal property. That, therefore, the city of Charlotte has the power to tax solvent credits, debts, &c., and that the plaintiff's are liable to this tax.

*Second.* Whether the tax levied under sec. 8 of the city ordinance is constitutional. The section is as follows:

"In addition to taxes above levied, there shall be a specific tax of one quarter of one per cent. on all real and personal property, as described in the preceeding section, for the purpose of paying the interest on the bonds of the city; and to

constitute a sinking fund, in pursuance of sec. 26, charter of the city of Charlotte."

The case shows that the "bonds" alluded to, are legal, by which we presume it is admitted that they are "old debts," and their validity not controverted. The twenty thousand (20,000) dollars of "deficiencies do not appear to be floating debts," as defined by Justice BYNUM, in *Weinstein* v. *City of Newbern*, 71 N. C. Rep., 537; and we think the presumption of law, from the facts stated, is, that they are not.

The court is therefore of opinion, that the tax being levied to pay interest on "old debts," and debts occurring by inadvertence, or unexpected contingency, from year to year, is valid and constitutional.

His Honor, for the reasons stated, gave judgment in favor of defendant. From this judgment plaintiffs appealed.

*Shipp & Bailey*, for appellants.
*Jones & Johnston*, contra.

RODMAN, J. Two important questions are presented in this case:

1. Have the corporate authorities of the city of Charlotte a right to tax the bonds, solvent credits and stocks of incorporated companies belonging to the plaintiff, who resides within the city, and also his income?

2. Have they a right to levy and collect taxes for all or any of the purposes stated in the case agreed, unless by a vote of the qualified voters of the city?

1. *As to the first question:* It is admitted by all that a municipal corporation has no power to lay and collect taxes unless such power be expressly or impliedly given by law, that is, either by its charter, or by some general law. In this case the amendment to the city charter, ratified January 25th, 1872, does undertake to give to the city, power to levy taxes "on all real and personal property, trades, licenses, *and other*

48

*subjects of taxation, as provided in sec. 3, Art. V, of the State Constitution."* Among the subjects of taxation there mentioned, are "moneys, credits, investments in bonds and stock," So that as far as the Legislature can give it, the city has the power to tax bonds, &c. But it is contended for the plaintiff, that the act of January 25th, 1872, is contrary to sec. 9, of Art. VII, of the Constitution, which reads as follows: " All taxes levied by any county, city, town or township, shall be uniform and *ad valorem* upon all *property* in the same, except property exempted by this Constitution." It is contended for the plaintiff if we correctly understood his argument, that this action contains a grant of the power of taxation to municipal corporations, which the Legislature cannot increase, and that it is confined to *property*, which in the sense in which it is there used, means only tangible property, and excludes bonds, &c.

We do not concur with the plaintiff in this view of the intent and effect of the section quoted. The Constitution does not expressly provide for the division of the State into counties. In many places, however, it recognizes the existing division. In Art. VII, of sec. 3, it provides for the division of counties into townships. In sec. 4, of Art. VIII, (which obviously belongs under Art. VII,) it is expressly empowers and directs the Legislature to provide for the organization of cities, towns and incorporated villages. This is a direct grant to the Legislature of a power to incorporate cities, &c.

The grant of such a power carries with it, by necessary implication, the power to endow cities with the usual and necessary incidents of an incorporated city, one of which undoubtedly is to tax all lawful subjects of taxation within it for all lawful purposes.

What the power of a city would be in respect to a power to tax, if the Legislature should merely incorporate it and impose on its corporate authorities the usual duties, without

making any express provision for taxation, we need not en-quire, as there is probably no instance of that sort.

The origin of the power of cities to tax, is not to be sought in the section of the Constitution quoted, sec. 9, Art. VII), but in the Act of the Legislature creating them, under the power for that purpose given by sec. 4, of Art. VIII. Section 9, of Art. VII, is not an enabling statute. It does not confer on cities, a power to tax, or on the Legislature a power to give them that power. Its purpose and intent was to restrain the power of the city by requiring an uniformity of taxation upon all property *ad valorem*, notwithstanding any possible attempt by the Legislature to give the power without such restraint. The terms of the section do not profess to give a power, but to regulate what it supposes to exist by virtue of a legislative act of incorporation. The existence of a power to tax in cities is also assumed in that clause of sec. 4, Art. VIII which requires the Legislature to restrict the power. If the power be not derived entirely from the charter of in corporation, either as expressly given, or by necessary implication, it cannot be derived elsewhere, for the Constitution nowhere confers this power on cities, either expressly or by necessary implication.

If this view be correct, it is not material for the present purpose, whether the word "property" in sec. 9, is confined to tangible property or not. For if it be so confined, it is a *limitation of a restraint* on the taxing power, and not on the power itself, and it would be competent to the Legislature to confer on a city a power to tax intangible property otherwise than uniformly and *ad valorem*.

We are of opinion however, that the word as here used, is not confined to tangible property. The word "property" is not such a technical one, that if properly used it has every where the same precise and definite meaning. Its meaning varies according to the subject treated of, and according to the context.

In its most general sense, it embraces every thing which a man may have exclusive dominion over. In this sense it is used in section 17 of the Declaration of Rights. "No person ought * * * * to be deprived of his life, liberty or *property* but by the law of the land." So in sec. 19. In all controversies at law respecting *property*, the ancient mode of trial by jury ought to remain sacred. So in sec. 22. No *property* qualification ought to affect the right to vote or hold office. In sec. 35, the words "lands" and "goods" have a like extensive signification, including things in action.

*Pipkin* v. *Ellison*, 12 Ired. 61, which is cited to show that the word does not include bonds, &c., decided only that where a testator bequeathed *all his property* to his wife for life, and after her death *to be sold and the proceeds divided*, *&c.*, he did not intend to include his notes, as notes were not usually the subjects of sale for division. Any general remarks in the opinion of the court, as to the meaning of the word, must be referred to the facts of the case, or else they are merely *dicta*. There can be no doubt I suppose, that a bequest of "all my property" to A. would pass bonds belonging to the testator. In *Pullen* v. *Commissioners of Raleigh*, 68 N. C. Rep. 451, it was held in conformity with our present opinion, that the power of a city to tax is derived from its charter, and as the charter of Raleigh, in enumerating the subjects of taxation, did not use the word "property," or any other word which could include securities for money, the city had no right to tax them. In *Lilly* v. *Commissioners of Cumberland*, 69 N. C. Rep. 300, it is held that solvent credits are property.

It is argued that as by sec. 3 of Art. V, the Constitution, after saying that "laws shall be passed taxing by an uniform rule, moneys, credits," &c., says, "and also, all real and personal property, *according to its true value in money;*" it thereby defined "property" as not embracing moneys, credits, &c. Such an inference is hasty, and cannot be fairly drawn.

WI. SON and others *v.* THE BOARD OF ALDERMEN OF THE CITY OF CHARLOTTE.

The intent seems to have been to leave it to the Legislature, in taxation for State purposes, to tax moneys, credits, &c., at their face value, or by some other standard than their "true value in money," whereas tangible property should be always taxed by the latter standard. If this construction be correct, and the words "all property," in sect. 9 of Art. VII include bonds, &c., then these, when *taxed by cities*, must be taxed *ad valorem*, that is, "according to their true value in money," although for State purposes, they are not required to be.

We think that the city authorities had a right, under the amendment to the charter, to tax the bonds, &c., of the plaintiff, and also his income. There is no suggestion that the bonds, &c., are taxed otherwise than uniformly *ad valarem*.

2. *As to the second question:* The purposes for which the taxes complained of are laid, are to pay the interest and principal, in part at least, of certain debts owing by the city. These are described in sec. 4 of the case agreed, from which they will be copied by the Reporter, and they need not be repeated here. None of them were submitted to a vote of the people before being contracted. That the voters of the city rejected a proposition to fund them, we consider immaterial.

If the charter contains any restriction on the power of the city to contract debts in the performance of its usual duties, and to lay taxes to pay such debt, it is found in sections 24 and 25. It is argued that these sections gave to the city government the power to incur a bonded debt, not to exceed $200,000, for any purpose which, in its opinion, would promote the general good of the city provided the object be first approved by a vote of the citizens; and that this proviso restricts the city from incurring debt, or at least from giving its bonds or notes to secure any debt without such approval. We think, however, that these sections relate only to the issue of city bonds in aid of railroads, and the restriction is confined to such bonds. It is only the surplus which may be raised by

the sale of its bonds in aid of railroads that may be applied to other objects, if the citizens approve of them.

The restriction relied on by the plaintiff is in sec. 7, Art. VII of the Constitution:

"No county, city, town, or other municipal corporation shall contract any debt, pledge its faith or loan its credit, nor shall any tax be levied or collected by any officers of the same, *ex cept for the necessary expenses thereof*, unless by a vote of a majority of the qualified voters therein."

We think the natural and proper construction of this section is, that the exception extends to every part of the preceding lines, to the prohibition to contract a debt, as well as to that against levying a tax. We are not at liberty to read it as if there were a period after the word credit, and a distinct sentence began after that. The effect of such reading would be to prohibit every municipal corporation from contracting any debt, absolutely and without qualification, and to make every debt contracted for whatever purpose, and under all circumstances illegal and void. Such a prohibition would be unreasonable. The duties of a county or city government cannot be performed without often contracting debts. Officers and servants of divers duties must be engaged, payable at some fixed interval daily, monthly, or quarterly, as the case may be. The contract for emyloyment creates a debt as soon as the service has been performed. It must necessarily remain a debt for some space of time, however short; and if the debt be thus made illegal, the corporation cannot lawfully pay, and the creditor cannot recover it. So of contracts to execute a certain work. For example, to build a bridge. An absolute prohibition to contract a debt, is a prohibition to contract at all, for every contract may and naturally does end in a debt. We cannot suppose that the Constitution intended to deprive these great and necessary public corporations of a power which is usual to all corporations, which these have possessed, and which is necessary to their usefulness, if not to

their very existence, except upon language which admits of no other meaning. It must sometimes happen that the city revenues for the year are insufficient to pay the necessary expenses of the year. This may happen accidentally or purposely for several years in succession, and thus a debt is contracted, made up of the several annual deficiencies. Such seems to be the origin of one class of the city debts, which the plaintiff contends are illegal. But if a debt be for necessary expenses and lawful in its origin, it cannot become unlawful, by a delay of the debtor to pay, which the creditor cannot prevent. Neither can it become unlawful because money is borrowed to pay the original creditors, and a note is given as a security for the loan. In such case the lender stands in the place of the original creditor.

The other class of debts objected to, are for the expenses of widening the streets of the city. It was argued that this was not a necessary expense. It would be difficult or impossible to draw a precise line between what are, and what are not, the necessary expenses of the government of a city. The analogy of the law of necessaries for infants is the only one that occurs to us. It is held, that if, considering the means and station in life of the infant, the articles sold to him *may* be necessaries under any circumstances, they come within a class for which the infant may be liable, and upon his refusal to pay, it is for a jury to determine whether under the actual circumstances they were necessary. If, however, the articles are merely ornamental, and such as cannot, under any circumstances, be necessary to one of the means and station of the infant, a court may, as matter of law, declare that the infant is not liable. We do not undertake to say that this analogy will furnish a rule which will admit of a close application. But if treated merely as an analogy, in the absence of other guides, it may be of some general use. It was held in *Broadnax* v. *Groom*, 64 N. C. Rep., 244, that if the object for which the money was to be raised came within the class of

such as might be necessary for the county, it was left to the county commissioners to decide whether in fact it was necessary or not, and their decision could not be reviewed by the court. This was also held in *Mitchell* v. *School Committee*, 71 N. C. Rep., 400.

No other rule could be adopted without inconvenience and injury. If no one could contract with a county for the building of a bridge, or with a city for the building of a market house, or other work coming apparently within the class of necessaries, and which the government of the corporation has deemed necessary, except at the risk of having the contract avoided by the decision of a court, which may take a view of the actual necessity different from that of the city government; then no one would contract without either charging an extra proportionate to the risk, or insuring safety by *getting* the opinion of the court if possible. The public business would be sacrificed or seriously obstructed, and the courts would assume the duties of municipal government, for which they were not intended. To make and repair the streets of a city is a duty generally, if not always, imposed on its authorities by the charter. It is within the class of necessary expenses. Widening the streets must come under the same class. The narrow and crooked ways which suffice for a village, may be insufficient for the passage and traffic of a populous and flourishing city. Whether the widening was in fact needed was in the discretion of the city authorities, as the building of a bridge was held to be in *Broadnax* v. *Groom.*

Admittedly, this power is liable to abuse. But the same may be said of all power wherever lodged. The Constitution has enjoined upon the Legislature the duty of restricting the power so as to prevent its abuse. If they neglect to do so, it is beyond the power of the courts to give relief. The only remedy is in the ballot box.

There must be judgment against the plaintiffs according to the case agreed.

BYNUM, J., *dissenting*. I concur in the opinion of the court, except that part of it, with its results, which puts a construction upon Art. VII, sec. 7, of the Constitution. I regard that clause, rightly understood, as the most important and beneficial provision in it, and believe that the ultimate solvency of these corporations, depends upon the vigorous enforcement of this salutary provision. To my mind, the construction presents no difficulty whatever, except that which grows out of a mistaken idea, that constitutions must be short and sententious, at the sacrifice of perspicuity. The obscurity of this section arises out of the fact, that it contains *two* propositions and *one* qualification to them. This enables the verbal critic, in violation of the rules of grammar, to apply the qualification to one proposition only, and regardless of both logic and grammar, exclude its application to the other.

To illustrate: 1 *Proposition:* " Sec. 7. No county, city, town, or other municipal corporation, shall contract any debt, pledge its faith or loan its credit." *Qualification:* " Unless by a vote of the majority of the qualified voters therein."

2 *Proposition:* " Nor shall any tax be levied or collected by any officers of the same, except for the necessary expenses thereof." *Qualification:* " Unless by the vote of the majority of the qualified voters therein." The fallacy consists in not applying the qualification to both propositions. Every writing contains these ellipses or omissions, which are to be supplied by the interpreter. Deeds contain the fewest, laws next, and constitutions, from this attempted brevity, contain the most ellipses. Supplying thus, what is omitted and must, in every written language, be understood, the whole section will read thus : " No county, city, town, or other municipal corporation, shall contract any debt, pledge its faith or loan its credit, unless by a vote of the majority of the qualified voters therein ; nor shall any tax be levied or collected by any officers of the same, except for the necessary expenses thereof, unless by a vote of the majority of the qualified voters therein." This is

the natural and grammatical construction, and by it only, can the obvious meaning and purpose of the Constitution, be carried into effect. These corporations, within certain limits and qualifications, are the judges of the expenses necessary for their due administration, and they are invested with power to levy taxes sufficient therefor. They are prohibited from levying taxes for purposes not necessary, and they are prohibited from *creating debts for any purpose, without the permission of the voters therein.* When they are forbidden to expend money for any other than necessary purposes, and are expressly authorized to *levy taxes* for such purposes only, why superadd the power to *create debts* for the same purposes?

1 *Objection:* This cannot be the true construction, because Art. VIII, sec. 4, declares : " It shall be the duty of the Legislature to provide for the organization of cities, towns and incorporated villages, and to restrict their power of taxation, assessments, borrowing money, contracting debts and loaning their credit, so as to prevent abuses in assessments and in contracting debts by such municipal corporations." If corporations were already restricted by sec. 7, Art. VII, why empower the Legislature to impose restrictions ?

1. *Answer.* Sec. 4, Art. VIII, applies to future corporations, and does not affect restrictions already imposed upon existing corporations. It enables the Legislature to impose further restrictions upon future corporations, if the existing constitutional restrictions are not sufficient to prevent abuses. No other construction can be placed upon this section, without making the constitution stultify itself.

2 *Objection. Ab inconvenienti.* These corporate governments cannot be administered without creating debts, as for payment of salaries, the police and other employees, the building of court houses, bridges and other necessary improvements, which are done by contract, which must result in a debt.

2. *Answer.* It may be *convenient* to contract debts, but it

is not *necessary* to do so.   If the money is in the treasury to pay salaries, employees and to discharge contracts as they become due, it is absurd to call such matters debts in legal contemplation.   Our salaries are paid by the State as they fall due, and all its obligations for necessary expenses are paid when the obligations are contracted, or the service is performed.  All the States, the United States, and many of the counties and towns of this State, act upon this cash principle, and find their advantage in it.   Why may not all do so ?   Every county or town knows the value of the taxable property in it.   The necessary expenses are easily computed, and the tax necessary to be levied to raise the required sum.   If a miscalculation happens to be made, or unexpected expenses create a deficit, just as the State is authorized to supply a casual deficit, (Art. V, sec. 5. Const.) just so it would be competent for counties and cities, to meet the deficiency by the next year's assessment.   What a State can do, a county or city can do, and what all the States of the Union do, all the counties and cities of this State may do—pay their necessary expenses without creating debts, in the sense and spirit of the Constitution.   Every creditor of a county or city is entitled to his pay when the service is performed.   Merchants generally make a deduction of from 10 to 20 per cent. on cash purchases.   If cities and counties acted upon like principles, a like or greater saving would follow.   As it is, nothing is more common than to see their " scrip " hawked about at fifty cents on the dollar in some places, to the injury if not ruin of the employees, who are the poor and needy of our population.

Suppose a court house is burnt down or a bridge is washed away, must a vote of the people be taken before a contract can be made for re-building it, or a debt contracted therefor? That would be a necessary but an unexpected expense, falling under the head of a "casual deficit" to meet, which it would be the duty of the county or city, if the money was not on hand to assess and collect taxes, at the earliest period.   Or, if

deemed more for the ease of the tax payer, to re-build on credit, he may be allowed to make his choice by his vote, for which express provision is made.

A distinction has been drawn between the power to borrow money and the power to contract a debt. According to the construction of the court, one is prohibited and the other is allowed, by this clause of the constitution. The distinction is rather attenuated and of but little practical value. It is generally " robbing Peter to pay Paul." If you borrow money to pay a debt, both sums bearing the same interest, you are no better or worse off. If you can make a better bargain with cash than credit, it is better to borrow. But I hold that, both to borrow and to create a debt, are prohibited unless the power is conferred by popular vote. Neither is necessary in a well-regulated State, county or city government, and both are the crying sins of the present times, alike threatening universal disaster, moral and pecuniary. It is not a question of convenience, but of power. When the Constitution speaks, we must obey. Here, obedience is wisdom and our gain.

3 *Objection:* Employees and others making contracts, would be defrauded, as they would not know whether the money was collected and in the treasury, or even whether the obligation was enforceable under this construction of the Constitution.

A*nswer.* This matter would soon regulate itself. If the law required the money to be in the treasury to meet necessary expenses, it would be there. If it was not there, it would soon be found out, and no harm would be done. As it is, scrip is issued, either at a depreciated value, to the loss of the county or city, or it is sold by the creditor at a depreciated rate, to his loss. Generally both parties are losers. It is the duty of every contractor to see that the person or corporation making a debt, has the power conferred on him or it to do so. Here, it is to be observed, the power to create debts is not withholden from corporations by the Constitution, but is expressly conferred *sub modo,* to-wit, by a vote of the corpo-

rators. All act with their eyes open, and no one is deceived, for all have equal and full means of knowing whether the essential pre-requisite to the creation of a valid debt, to-wit, the sanction of a popular vote, has been complied with. It was expressly so held by this court in *Broadnax* v. *Groom*, 64 N. C. Rep., 244, and strongly intimated in *Weinstein* v. *City of Newbern*, 71 N. C. Rep., 535.

4 *Objection.* The restriction upon the power to contract debts, was intended to apply so as to prohibit subscriptions to railroads and the like purposes.

*Answer.* Such an intention cannot be implied from the language of the Constitution. It is not so declared. Where, then, do we derive our right as Judges, to say the restriction applies to one purpose more than another, when the plain terms of the section apply to every purpose? I can well conceive cases where it would be more necessary to the growth and prosperity of a county or city to build railroads through or to them, than to build a market house or a bridge. Under the term "necessary expenses," there are many other purposes for which debts may be contracted, as dangerous to the tax payers as the building of railroads. Such a construction only avoids one evil by flying to another. There is only one way of escape, and that is by applying the plain prohibition against the contraction of any debt, for any purpose, except in the way prescribed, to-wit, by popular vote.

According to the construction put upon it by the court, Art. 7, sec. 7, had as well be struck from the Constitution; as I am of opinion that practically, it is thereby made inoperative. If the counties and cities are the judges of what are their necessary expenses, and they have the power to contract debts without limitation for these purposes, it is difficult to see what the prohibition against contracting debts is to act on, or wherefore "a vote of the majority of the qualified voters therein" should br taken. In my opinion, to such an impotent conclusion are we led. But is it right?

The benefits to be derived and the evils to be avoided by a cash administration of government, are too obvious for further comment. The county of Mecklenburg, for one, wisely and with the most beneficial results, acts upon that system. No sufficient reason can be suggested why the city of Charlotte may not administer the city government upon the same principle. In my opinion the Constitution enjoins it.

PER CURIAM.                                Judgment affirmed.