Action by plaintiff administrator for damages sustained by the death of his intestate, which, he avers, was caused by the negligence of the defendant corporation.
It is alleged and admitted that defendant, pursuant to authority conferred by its charter, erected and, prior to 1 March, 1903, maintained a telephone line, consisting of poles and wires strung thereupon, (431) along the public road from Forest City to Caroleen, in the county of Rutherford.
It was in evidence, without controversy, that some eight or ten days prior to 8 March, 1903, the overseer of the public road plowed along the side of the road within 8 or 10 inches of one of defendant's poles, "leaving it in a dangerous condition"; that before this time the pole was in a secure condition — that it was "all right"; that the overseer notified defendant's lineman of the condition in which the pole was left after he had plowed near it. There is no evidence showing when the notice was given. That on Saturday night, 7 March, 1903, a heavy rain fell, washing the earth away from the pole, and by reason thereof it fell across the road.
One J. C. Carpenter, a witness for defendant, says that he passed along the road on Sunday, 8 March, 1903, at about 2 o'clock in the afternoon; that the pole was "flat down across the road." He was in a hack, with two other persons. Two poles were down. That they were the first persons who passed after the pole fell — this was shown by the wheel tracks; that he, with the assistance of those with him, lifted one pole and passed under it; the other pole they straightened up — set it in the ground, "right back in the old hole," and propped it up with a pine stick from 6 to 8 feet long; the lower end of the prop was in the edge of the road, extending into the road about 4 feet. They got the prop from Mr. Morrow's woodpile. Four persons propped the pole. "We could have driven under it like we did the other one. It could not have been removed without breaking the wire." The prop could have been struck by a buggy passing. The road hands had worked close up to the pole. The witness met plaintiff and his daughter between the pole and Forest City; they were going towards the pole. We propped it up to get it out of the way."
One witness testified that he drove by the pole and saw that it was propped. "The prop was sticking out in the edge of the road. (432) I drove around it. I had to do so to keep from hitting against it. If I had kept straight in the road I would have hit the prop. The pole was right at the edge of the road, and the lower end of the prop was sticking out in the road. The prop was out where, if any one went along in the usual driving place, he would hit it." *Page 315 
Mr. Morrow, for plaintiff, testified that he went to the pole just after the accident; found the pole on the side of the road and a prop lying with it. "The prop was between 5 and 7 feet long. I noticed where the buggy was driven. The prop was not long enough to reach into the rut."
On Sunday, 8 March, 1903, between 2 and 3 o'clock in the afternoon, plaintiff, in a buggy with his daughter, passed along the road from Forest City to Caroleen. He says: "She (my daughter) was sitting on the side next to the pole. She had a bank statement in her hand. I was not looking. The pole fell and struck her on the head and hurt her. There was one pole back of us, 10 or 20 steps from us; it fell at the same time. The base of the pole was from 6 to 8 feet from the rut of the wheels. Our buggy was in the center of the road when the pole fell. The wheels were in the current or middle of the road. When the pole fell the mule ran 40 or 50 yards. I then went back to the place and found the pole across the road, and also a prop by the side of the road. The prop was 4 or 5 or 6 feet long and as large as my arm. There was a place where the end of the pole stuck, 3 or 4 feet from the rut. I was just driving along the road, and my daughter was looking at a bank statement when the pole fell."
There was other testimony, but in the view taken by the court the foregoing only is material. The court submitted the following issue: "Was the death of the plaintiff's intestate caused by the negligence of defendant, as alleged?"
Defendant requested the court to instruct the jury that if they believed the evidence of the witnesses, both for the plaintiff and the defendant, they should answer the issue "No." The request was denied. Defendant excepted. There was a verdict and judgment (433) for plaintiff. Defendant appealed.
Pless Winborne and Ryburn Hoey for plaintiff.
After stating the case: Before discussing the principal question involved in this appeal, it is important to note a difference, in an important respect, between the testimony certified to us in this and the former appeal (141 N.C. 455). In that appeal Alexander Mayes, a witness for plaintiff, after testifying in regard to the condition in which the pole was left by the overseer of the road, eight or ten days before the accident, says: "I told the lineman about the dangerous condition of the pole two or three days after we had worked the road. I told him it was the pole near Morrow's stable. In a few days I noticed a stob had been driven by the pole, but that did not appear to make it any safer." (Record, p. 13) In this record the same witness says: *Page 316 
"I made report to the lineman of defendant company. I told him the pole was dangerous, and if it rained and the ground got wet, that it would fall. I told him which one it was."
The first testimony, if true, showed negligence, either in failing to repair the dangerous condition in which the road overseer left the pole or in doing so negligently. If the lineman was told of its dangerous condition "two or three days" after the work on the road, it was at least six or seven days before the injury was sustained by plaintiff's intestate. To fail to repair the condition and make it secure, after six or seven days notice, was manifest negligence. His Honor, Judge Allen, so regarded it. From the testimony in this appeal it does not appear how long prior to the accident notice was given the lineman. It is clearly the duty of a telephone company to exercise reasonable care — and (434) reasonable care is, in this respect, a high degree of care — to select sound poles and to place them securely in the earth to prevent them falling, under ordinary and usual conditions, having due regard to the effect of rain and frost in loosening the earth, and prevailing winds blowing them down. The duty of reasonably careful construction is followed by like care in maintenance and inspection. Joyce Elec. Law, 605. The duty of inspection, in regard to its frequency, cannot be made definite, but regard must be had to the character of the soil, the condition of the weather, the season of the year, and such other conditions as may affect the security of the poles and the safety of the traveling public.
It is conceded that the defendant had discharged its duty in regard to construction of its line. Plaintiff's witnesses say that before the road overseer plowed near to it the pole was secure — "all right." We cannot say that a failure to inspect for eight or ten days, in the absence of any notice of trouble, was negligence. In the absence, therefore, of evidence of the time the lineman was notified of the dangerous condition of the pole, we think there was no evidence of negligence. The mere fact that the pole fell on Sunday, following a heavy rain the night previous, would not constitute evidence of a failure to repair within a reasonable time after notice, there being no evidence when notice was given.
In view of the fact that this case has been twice tried and a new trial upon this point would prolong an expensive litigation, and in view of the further fact that the cause was tried below and argued in this Court upon its merits, we deem it our duty to express the opinion to which we have arrived. When the case was here upon a former appeal a majority of the Court thought that plaintiff should have gone to the jury, under JudgeAllen's instructions. The case as now presented enables us to pass upon the right of plaintiff to recover upon his own and such portions of defendant's evidence as are not contradicted and which the jury *Page 317 
may find to be true. Defendant requested his Honor to instruct (435) the jury that if they found the entire evidence to be true, plaintiff was not entitled to recover. This request assumes the truth of plaintiff's evidence, and that, taking the defendant's evidence to be true, it entitles the defendant to a verdict. In this respect it differs from a motion for judgment of nonsuit.
Before stating the case thus presented, we will eliminate the question whether plaintiff's buggy wheel struck the prop placed by Carpenter to support the pole and thereby caused it to fall. More than one conclusion may be drawn from the testimony upon this point. Hence we must, in discussing the request for instructions, assume that the wheel did not strike the prop. We do not think that there is any evidence of negligence on the part of plaintiff. We also assume, for this purpose, that defendant's lineman was guilty of negligence in failing to repair the condition of the pole, and that it fell by reason of such negligence, thus eliminating the heavy rainfall on Saturday night.
Thus considered, the case comes to this: The pole, having fallen by reason of defendant's negligence, was lying on the ground, across the road, on Sunday. Carpenter and several others came along and put the pole back in the hole from which it had fallen by reason of the support being removed by the overseer of the road, and the rain. He and those with him, for the purpose of making it secure, went to a woodpile near by and got a pine stick or pole, of the size and length described by them, and propped the pole in the manner described. They propped it up to get it out of the way. They could have held it up and driven under it, as they did another pole not far away. Carpenter had no connection with and did not act in behalf of defendant. In less than an hour after Carpenter put the pole up, the plaintiff and his daughter, riding in a buggy and driving a mule, came along the road, and, just as they passed, without any suggestion of the immediate cause, other than inherent weakness in the support which it had, the pole fell, the mule ran and, in some way, immaterial in this connection, but difficult to (436) understand, the daughter received a severe concussion of the brain, without being hit by the pole, became unconscious and, in six weeks, died.
The question is thus presented, whether the act of Carpenter or the original negligence of defendant, in legal contemplation, was the proximate cause of the injury sustained by plaintiff's intestate. We think it manifest that Carpenter negligently — that is, insecurely — placed the pole in the hole from which it had recently fallen. The dangerous condition in which it was left by the overseer was the result of plowing near to it, removing or loosening the earth by which it was supported. This, followed by the heavy rain, caused the pole to fall. This was manifest *Page 318 
to Carpenter. All of the evidence is to this effect. Carpenter and those aiding him recognized it by going to a woodpile and getting the pine stick with which to prop it. That it fell within a short time — less than an hour — shows that it was left by Carpenter in an insecure and dangerous condition. His motive — purpose — was doubtless to restore the pole and serve the defendant and its patrons, but the act was unauthorized. He could not impose upon defendant any new or different duty or liability from that which it assumed by its original negligence. If the pole had struck plaintiff's intestate when it fell the first time, or if, after being down across the road, she had, without contributory negligence, driven against it and been injured, the defendant would have been liable. It was liable for all such damages as resulted or flowed in ordinary natural sequence from the negligent omission to repair the dangerous condition of the pole after a reasonable opportunity to do so; the reason being, as said by Pollock, probably the most accurate writer on the subject, "that a person is expected to anticipate and guard against all reasonable consequences of his negligence, but that he is not expected to anticipate and guard against that which no reasonable man (437) would expect to occur." Torts, 40, citing Greenland v. Chaplin, 5 Ex., 248; Ramsbottom v. R. R., 138 N.C. 38. Discussing this question, Mr. Justice Walker, in Drum v. Miller, 135 N.C. 204, quotes with approval the language of Judge Cooley: "When the act or omission complained of is not in itself a distinct wrong, and can only become a wrong to any particular individual through consequences resulting therefrom, this consequences must not only be shown, but it must be so connected, by averment and evidence, with the act, or omission, as to appear to have resulted therefrom, according to the ordinary course of events, as a proximate result of a sufficient cause." Cooley on Torts, p. 74. This principle would have been illustrated and applied if plaintiff's intestate had been injured by the first falling of the pole or by driving against it while down across the road. Carpenter's act introduces a new element in the case and renders it necessary for us to seek another principle by which to determine defendant's liability. It is manifest that, but for Carpenter's act, the pole could never have fallen upon plaintiff's intestate. So far as the dangerous condition of the pole, which imposed upon defendant the duty of securing it, was concerned, when it fell its power to injure by falling was exhausted. No one having been injured in the falling, the case was damnum absque injuria. The duty thus imposed upon the defendant was to remove the obstruction from the highway, and a failure to do this promptly, under the circumstances, rendered it liable for injuries sustained by any person traveling the highway. The pole was down across the highway by reason of defendant's negligence, because, for the purpose of this *Page 319 
discussion, we eliminate the heavy rain as a casual element in producing the condition. Assuming that defendant knew the pole was in a dangerous condition and liable to fall, either with or without the heavy rain, it was fixed with notice that it had fallen — that is, that the probable result of its negligence had occurred. In this condition of the case we find a satisfactory statement of the law in Wharton on Neg., 138. He says: "Suppose that, if it had not been for the (438) intervention of a responsible third party, the defendant's negligence would have produced no damage to the plaintiff: is the defendant liable to plaintiff? This question must be answered in the negative, for the general reason that causal connection between the negligence and damage is broken by the interposition of defendant's responsible human action. I am negligent on a particular subject-matter. Another person, moving independently, comes in and, either negligently or maliciously, so acts as to make my negligence injurious to a third person. If so, the person so intervening acts as a nonconductor and insulates my negligence, so that I cannot be sued for the mischief which the person so intervening directly produces. He is the one who is liable."
The rule, as announced by Justice Strong, in R. R. v. Kellogg,94 U.S. 469 (p. 475), is usually regarded as sound in principle and workable in practice. He says: "The question always is, Was there an unbroken connection between the wrongful act and the injury — a continuous operation? Did the facts constitute a continuous succession of events, so linked together as to make a natural whole, or was there some new and independent cause intervening between the wrong and the injury? It is admitted that the rule is difficult of application. But it is generally held that, in order to warrant a finding that negligence, or an act amounting to a wanton wrong, is the proximate cause of an injury, it must appear that the injury was the natural and probable consequence of the negligence, or wrongful act, and that it ought to have been foreseen in the light of attending circumstances."
In many of the cases found in the reports, in which it is claimed that intervening agencies have broken the causal connection between the wrong and the injury, it will be noted that the intervening agencies are either natural or conventional conditions, as when a house is negligently burned, whereby the fire is communicated to other houses more or less remote from the original, and winds or other natural (439) causes have changed or controlled the course of the flames. Here the intervening agency is free, intelligent, and independent, in the sense of a self-controlled person who interposes and changes the conditions which he finds existing when he enters upon the scene. The liability, if any exist, for his conduct is vicarious. Adopting either view of causation as the basis of liability — that of "natural and *Page 320 
probable consequences," or "what ought reasonably to have been anticipated and guarded against" — we think the same conclusion follows in this case. Dr. Wharton says: "Reserving for another point the consideration of consequences resulting from the indefinite extension of vicarious liabilities, we may now ask whether, on elementary principles, the action of an independent, free agent, taking hold, unasked, of an impulse started by us and giving it a new course, productive of injury to others, does not make him the juridical starting point of the force so applied by him, so far as concerns the person injured. For the spontaneous action of an independent will is neither the subject of regular, natural sequence, nor of accurate precalculation by us. In other words, so far as concerns my fellow-beings, their acts cannot be said to have been caused by me, unless they are imbeciles or act under compulsion or under circumstances produced by me which gave them no opportunity for volition." This language excludes nonliability for the acts of one under compulsion by reason of conditions produced by the original wrongdoer, as, in the Squib case, the throwing of the squib by the intervening persons was for their protection from danger to which the defendant gave the first impulse. They were not "free agents."Scott v. Shepherd. 2 Black, 892; 1 Smith L. C., 549. Of course, if Carpenter had been defendant's servant, acting within the scope of his employment, the liability would have attached, upon the doctrine of qui facit per alium, etc.
(440) When the cause was before us on the other appeal, the majority of the Court conceded that Carpenter's act "intervened and was the efficient cause of the injury" (141 N.C. 462), but the doubt was expressed whether it was a "new and independent cause." Citing the language of Barrows on Negligense, it is said "If, however, the cause — the intervening cause — be of such a nature that it would be unreasonable to expect a prudent man to anticipate its happening, he will not be responsible for damages resulting solely from the intervention." Conceding this to be true, we have in the evidence a striking illustration of the dividing line between liability and nonliability. Defendant knew that the pole was in a dangerous condition — that the probability of its falling was increased by rain. That it might rain was reasonably probable. Therefore, although the pole may not have fallen if it had not rained — and in a certain sense the "heavy rain" caused the pole to fall — yet, because it was an intervening cause which would naturally and ordinarily have occurred, and one which ordinary foresight ought to have "anticipated and guarded against," the defendant, by reason of its original negligence, is not permitted to escape liability upon the suggestion of broken causal connection between the "wrong and the injury." But can it be said that, in addition to this, *Page 321 
it could have reasonably anticipated that Carpenter and his associates — a free, intelligent agent — coming along and seeing two poles down across the road, would lift up one and pass under it, and would undertake to put the other back in the hole from which it had just fallen, and, further, would go to a woodpile near by and get a pine stick with which to prop the pole? Can it be that all of this on the part of Carpenter was a natural, orderly, unusual sequence from the original negligence, or that his action was a subject of ordinary precalculation or foreknowledge? "Can we regard the independent action of intelligent strangers as something that is in conformity with ordinary natural law, or as something that can be foreseen or preasertained?" The fact that Carpenter disposed of the two poles in the same situation (441) in an entirely different manner — lifting one up and passing under, and putting the other back in the hole — is a practical demonstration of the difficulty of following the argument of prevision to the length claimed by plaintiff. Assuming that defendant knew that the pole had fallen, is it reasonably probable that it would or could foresee that some one would come and negligently put it back in the hole, in plain view of its condition? It is an entirely reasonable conclusion that the first traveler along the road would either push, pull or lift it out of his way, and if in doing so he left it in a dangerous condition, whereby plaintiff was injured, the case would come within the principle of Clark v. Chambers, 3 Q. B., 327; 47 L. J. Q. B., 427; 19 Eng. Rul. Cas., 28, relied upon by plaintiff. In that case defendant had obstructed the highway with a hurdle and two wooden barriers armed with spikes. Some one came along and removed one of the chevaux-defrise hurdles from the place where it stood, and placed it across the footpath. Plaintiff, passing there in the dark, ran against it and was injured. The Court held that defendant was liable. Pollock on Torts, 49, says that the decision, or at least the ground upon which it is put, is not in harmony with other cases. He says: "However, their conclusion may be supported, and may have been to some extent determined by the special rule imposing the duty of what is called `consummate caution' on persons dealing with dangerous instruments."
In Sharpe v. Powell, 7 L. R. (1872), 253, Bovill, C. J., says: "No doubt, one who commits a wrongful act is responsible for the ordinary consequences which are liable to result therefrom; but, generally speaking, he is not liable for damage which is not the natural or ordinary consequence of such an act, unless it be shown that he knows, or has reasonable means of knowing, that consequences not usually resulting from the act are, by reason of some existing cause, likely to intervene so as to occasion damage to a third person." Pollock says: "Whether Chambers v. Clark can stand with it or not, (442) *Page 322 
both principle and the current of authority concur to maintain the law as declared in Sharpe v. Powell." We have examined a number of decided cases in which the doctrine involved here is discussed. It is uniformly conceded that, while the principle is clear, the application is difficult, and variant combinations of fact render decided cases of but little value as authorities. When the facts are in controversy, or more than one conclusion of fact may be drawn, the question is submitted to the jury. When the facts are admitted, or found by the jury, and the conclusion is clear and certain, it is a question for the court.
After more than usual reflection and investigation, with the aid of exhaustive argument by able counsel, we are of the opinion that the defendant was entitled to have the court instruct the jury that if they believed the evidence they should answer the first issue "No."
We have not discussed the several instructions given by his Honor, because our opinion renders it unnecessary to do so. It is but just, however, to say that his Honor followed the rule laid down in the opinion of the Court. There was some difference in the testimony, to which sufficient weight was not given.
For the error pointed out, there must be a
New trial.