This action was brought to recover damages for injuries alleged to have been caused by the defendant's negligence. Plaintiff was employed by the defendant as a lineman, in connection with the operation of its electric lighting plant, and on the day of his injury he was (284) directed by his foreman to climb one of the poles for the purpose of repairing or removing one of the wires attached thereto. In order to perform his work it was necessary for the defendant to wear spurs or spikes on his feet, and to fasten himself with his belt to the pole, and while he was near the top, doing his work, the pole fell to the ground, rebounded, and caused him serious injury, by reason of which he became unconscious and was confined to the hospital under medical treatment for a long time. There was evidence tending to show that the pole was rotten and in very bad condition several inches under the ground, and that it broke three or four inches below the surface of the ground. It was a juniper pole and should have lasted, so as to be *Page 239 
used with perfect safety, from six to twenty years, and it had been standing only three years when it fell with the plaintiff. There was no rule or custom imposing upon the plaintiff the duty of inspection before ascending the pole, and there was nothing in its appearance calculated to put him on notice as to its condition. Above the ground it seemed to be sound and trustworthy, except, as one of the witnesses testifies, at the very top it was rotten; but that part of it which he was required to use was apparently sound and safe.
There is ample evidence in the record to show that the pole was not one which should have been selected in the beginning, and after ordinary inspection, as sufficiently sound and strong for the uses to which it was intended to be applied. An are light was suspended from the pole by a wire, the other end of which was attached to another pole on the opposite side of the street.
A witness for the plaintiff gave the following description of the pole: "I looked at the pole after he fell. I do not know what became of it. The pole was rotten. It was as rotten as it could be. It broke off between three and four inches under the ground. They did not have any guy wires supporting the pole at that time. They did not have any braces of any sort on it to support it. It had the strain of the light on it. They did not have anything on it to relieve that strain; they only had the pole set back like this. It was leaning from the lamp. The lamp pulled it in the street. If it had not been for the lamp on (285) it, it would have fallen like it started. It was a juniper pole. It was rotten between three and four inches below the ground. It was rotten on the outside." This witness further stated that the pole was not rotten above the ground, and that if an inspection had been made, it would have been taken down, and that no inspection was made to his knowledge.
Another witness gave this description of the pole: "The pole was broken off three or four inches under the ground and was decayed or rotten. You could take little pieces of the wood in your hands and break it up into dust. It had heart that looked sound, but you could take it in your hands and break it up. No one passing there could tell whether the pole was rotten or not, on account of the shell on the outside being hard. You could not tell whether the pole was rotten by the outside, nor unless you pried into the skin on the outside. You could tell by digging around it. There were no guy wires or braces supporting the pole."
The defendant introduced the affidavit of Manly Pearson, made a few days after the pole fell, and therein, among other things, he made this statement: "There was grass grown around the pole at the bottom. *Page 240 
Pole seemed to be solid. Showed no appearance of decay above ground or above grass. Pole broke off about three inches underground. Where pole broke, that is, place on pole, it was rotten and decayed: you could stick your finger in it; it was spongy, soft, thoroughly decayed; and the only solid spot in the pole was a streak in center, the heart, about an inch or so in diameter. There was no support to poles. There were no `guy' wires on poles. The only wire on pole that fell was wire running from it across street to other pole, from the center of which in the middle of street was suspended an electric `arc' light, weight about 50 pounds. Distance from pole to pole about 40 feet. There was a powerful strain on poles, pulling against each other, and weight of light, and no supports, `guy' wires, or anything behind poles to resist this pressure. I have been engaged in this kind of work for eighteen years. Have worked in South Carolina, Georgia, Alabama, and other States, and most all poles had `guy' wires on back of poles to support them. These `guy' wires are necessary to hold (286) poles in position. It is not customary for a lineman to examine poles under the ground, when working on them. That is always done by another man."
There was evidence to the effect that it was not customary to guy poles like the one in question with no more strain on them than it had, and that the appearance of the pole above the ground did not indicate that it was rotten or unsound, and the city did not have its poles inspected except in a casual or general way, "that is, by passing and looking at them." If the pole had been guyed, it would not have fallen, though there was evidence it was not customary to guy such poles.
There was much additional evidence introduced by the parties to sustain their respective contentions, but it is not necessary to an understanding of the case that we should set it out.
The court, among other instructions, charged the jury as follows:
If Terrell was an experienced lineman, and there was no regular pole inspector employed by the defendant, the duty of inspecting a pole, as to its safe or dangerous condition, rested as much upon the plaintiff, Terrell, as it did upon the defendant town; and if you find from the evidence that the plaintiff was a person of ordinary information and had experience in the business in which he was engaged, and the town employed no regular or special pole inspector, then he assumed the risk of the breaking of any pole which he was called upon in the line of his duty to climb, not due to any defect in the original setting, and the town owed him no duty to inspect it and inform him of its defects, or to keep it sound; and if you find these to be the facts, you will answer the first issue (as to negligence) "No." *Page 241 
If you find from the evidence that the pole, at the time it was set in the ground, was sufficiently sound and solid and of sufficient size not to have broken with the plaintiff and was properly erected, as has been explained to you, and you should further find that the plaintiff was an experienced lineman, then the changes by time and exposure produced in the pole was a risk the plaintiff assumed, and you will answer the first issue "No." If you find from the evidence that the pole which broke and fell with the plaintiff was properly set originally, and the breaking was not from any negligence in the original setting, (287) but only from failure to keep it inspected and examined, and the plaintiff was an experienced lineman, you will answer the first issue "No." If you find that the plaintiff had the experience which I have spoken of, as a lineman, and that the pole was properly erected in the first instance, as I have heretofore fully instructed you, then I say that no further duty of its inspection from time to time rested upon the town; and if under such circumstances he was hurt by the falling of the pole, it would not be negligence attributable to the defendant, and you would answer this first issue "No." Or if the pole fell because there was some rottenness in it and below the surface of the ground, and it was concealed by reason of any hard shell on the outside of the pole, so that if the ordinary inspection of poles of this kind, either by the defendant or the plaintiff, or both of them, would not have disclosed the defect and the consequent danger in climbing it, as it was, and because of this hidden defect in the pole, when it was subjected to the additional weight of his body and the necessary movements of his arms, and handling the wires, etc., it fell and injured him, his fall would be an accident for which no one would be blamable in law, and in such case you will answer the first issue "No."
The jury rendered a verdict for the plaintiff, and judgment having been entered thereon, the defendant appealed.
After stating the case: The court, in addition to the instructions we have taken from the charge, told the jury that if the defendant set a pole in the ground which was unsound or unfit for use, or the defectiveness of which it could have ascertained at the time by the exercise of ordinary care, and also failed to brace or guy the pole, if the jury found that persons of ordinary prudence used the guy or brace under such circumstances, they would answer the first issue, as to the defendant's negligence, in the affirmative, provided they also found *Page 242 
that the pole fell with the plaintiff, and its fall was caused (288) directly and immediately by its unsoundness and the failure of defendant to brace the same, and that guys or braces were appliances which were approved and in general use for securing a pole like this one in a safe position. It is evident that the jury found, under the evidence and the instructions of the court, that the pole was originally defective, either to the actual or constructive knowledge of the defendant, and was not such a one as should have been used for the purpose to which it was applied.
We emphasize the foregoing instruction of the court and the fact found by the jury to distinguish this case in limine from those cited by the defendant's counsel as authorities for his contention that the duty of inspection rested upon the plaintiff and not upon the defendant. We believe that they all hold that this principle does not apply if the pole was originally unsound and unfit for use, and that it is the duty of a telegraph or telephone or electric light company, when it selects a pole for use in its line, to inspect it for the purpose of ascertaining if it is sound and fit. By party of reason the same is the duty and obligation of a city to its employees when it constructs and operates an electric light plant of its own, for it is not a public or governmental function, but a private and corporate duty, in the discharge of which the municipality will be held to the same degree of liability as an individual in like circumstances. Fisher v. New Bern, 140 N.C. 506.
But we are of the opinion that a city does not perform its whole duty by merely selecting a sound and safe pole in the beginning, but it must, by proper and reasonable inspection, keep it sound and safe for the use of its employees and the protection of the public, and in this respect we can perceive no valid reason why its duty should be less strict than is generally required of a master to exercise reasonable precaution for the safety of his servant. This general duty has been thoroughly settled by the authorities. The master personally owes to his servants the duty of using ordinary care and diligence to provide for their use reasonably safe instrumentalities of service. Among these are a reasonably safe place in which to do their work or to stay while waiting orders, reasonably safe ways of entrance and departure, an adequate (289) supply of sound and safe materials, implements and accommodations, with such other appliances as may reasonably be required to insure their safety while at their work or passing over his premises to or from work. These things must, moreover, be adapted to the work in hand. It is not enough that they should be good, under ordinary conditions. They must be suitable for the work to which they are applied by the master, and properly adjusted to each other. If, therefore, the *Page 243 
master knows or would have known if he had used ordinary care to ascertain the facts, that the buildings, ways, machinery, tools, or materials which he provides for the use of his servants are unsafe, and a servant, without contributory fault, suffers injury thereby, the master is liable therefor, although he is not thus liable, in the absence of actual or constructive notice.
The master is not entitled to time to discover defects in things which are defective when put in use. He should examine them before putting them in use. He cannot evade his responsibility in these respects by simply giving general orders that servants shall examine for themselves, before using the place, material, etc., furnished by him. The fact that a servant could, by care and caution, so operate a defective and dangerous machine as not to produce injury to his fellow-servants does not exempt the master from his liability for an omission to exercise reasonable care and prudence in furnishing safe and suitable appliances. The master fails to supply a "safe place" for work if he allows work to be conducted there habitually in a manner needlessly dangerous to servants. The master is also personally bound from time to time, to inspect and examine all instrumentalities furnished by him, and to use ordinary care, diligence, and skill to keep them in good and safe condition. The duty of inspection is affirmative and must be continuously fulfilled and positively performed. Such duty is not discharged by giving directions for its performance, or by promulgating rules requiring it to be performed, or by employing competent and careful persons for that purpose. The master is not responsible for the want of repairs when he has neither actual nor constructive notice of their need; and this notice is not presumed, but must be proved by the servant. And it must be proved that he was chargeable with notice of the particular defect (290) complained of. But he is chargeable with constructive notice of whatever, by the use of ordinary care and diligence, he might have discovered and thereby avoided the danger incident thereto. He is entitled to reasonable time, after notice of a defect, within which to make repairs, and if, during that period or while he is repairing, an injury occurs to a servant, the question of a master's negligence depends upon his diligence under all the circumstances. This statement of the law has been adopted in Sh. and Redf. on Negligence (5 Ed.), sec. 194, and in the main is sustained by our own decisions. Cotton v. R. R.,149 N.C. 227, and cases cited; Leak v. R. R., 124 N.C. 455.
We think the principle applies to the case in hand. The question in one form was presented in Harton v. Telephone Co., 146 N.C. 429, and we then said: "The duty of reasonably careful construction is followed by like care in maintenance and inspection. Joyce Elec. Law, *Page 244 
605. The duty of inspection, in regard to its frequency, cannot be made definite, but regard must be had to the character of the soil, the condition of the weather, the season of the year, and such other conditions as may affect the security of the poles and the safety of the traveling public."
It is contended, however, by the defendant that the duty of inspection belonged to the plaintiff, and his failure to discover the defect in the pole was his own and not its fault. The proof is that the unsoundness of the pole was not apparent to the naked eye. It was below the ground and would not be discovered except by digging around the pole and removing the earth which concealed it.
We cannot yield assent to the argument, at least under the circumstances of this case, that such a duty was imposed upon the plaintiff in caring for his own safety, and we discover nothing in the evidence to indicate that the plaintiff was guilty of any contributory negligence. In Barkley v. Waste Co., 147 N.C. 585, Justice Brown, in discussing the liability of the defendant for injuries to one of its employees who, while performing his work, fell from a defective scaffold and was (291) injured, said: "The defendant owed to its employees, who were directed to work on the scaffold, the duty to exercise due care in selecting materials reasonably suitable and safe for its construction. 2 Labatt, sec. 614; Bushwell on Personal Injuries, secs. 193, 391, 392; 4 Thompson Neg., sec. 3957, note 30; Starwick v. Butler, 93 Wis. 430;Bridge Co. v. Castleberry, 131 Fed., 181. If defendant delegated the performance of this duty to Michael, it is responsible for the manner in which he discharged it. Tanner v. Lumber Co., 140 N.C. 475; Averyv. Lumber Co., 146 N.C. 592; McCarthy v. Clafin, 99 Me. 298. The evidence of witness Wooten is to the effect that the scaffold was built of old material that was scorched in the fire when the building was burned. There is also evidence that the wood was knotty, and that the piece which gave way broke at a knot. These facts, if true, do not per se
constitute negligence, but we think they are some evidence to be considered by the jury as bearing upon the inquiry as to whether the defendant exercised reasonable care in selecting material suitable for the construction of a lofty scaffold upon which its servants were required to work. We fail to see any evidence of contributory negligence. The plaintiff took no part in selecting the material or in erecting the scaffold, and knew nothing of the character of the material out of which it was constructed. The scaffold was a completed instrument and supposed to be safe when plaintiff was directed to work upon it. The fact that he made only a casual examination does not make plaintiff culpable. He had a right to rely upon the assurance of the foreman that the scaffold *Page 245 
was safe, as he was unacquainted with either the character of the construction or the quality of the material. Liedke v. Moran, 43 Wn. 428;Swanson v. Jenks, 92 N.Y. 382.
There are two propositions stated in the quotation: (1) That the condition of the material, or lumber which entered into the construction of the scaffold was at least evidence of negligence. (2) That the plaintiff was not required, himself, to make more than a casual examination of the scaffold, and his failure to do so was not contributory negligence, as he had the right to rely on the assurance of the (292) foreman that the scaffold was "all right," that is, a safe one. There is no substantial or practical difference between the two cases. We do not see why a master should be excused for setting an unsound and unsafe pole or for permitting it to become and remain so, when he would not be, under similar circumstances, for erecting a scaffold, both having been constructed for the use of his servant.
There is one difference between the two cases, for in the case of the scaffold the servant was expressly told that it was safe, while in the case of the pole he was given an implied assurance that it was sound and safe, when he was ordered to climb it for the purpose of removing or adjusting the wires; but this is a difference in form and not in substance.
It is a general rule that the servant, in the absence of any warning from his master, or knowledge of a defect, has a right to rely upon the safety of the instruments and appliances which he is required to use in the service, because it may fairly be presumed that the master has performed his primary duty, that is, care in the original selection and subsequent inspection of such instrumentalities.
In Electric Co. v. Kelly, 57 N.J. L., 100, the company was held not to be liable for injuries to the plaintiff, Kelly, produced by the falling of a pole, but for the reason that the fall was caused by a weakness in the pole, brought about by a previous fall or by a defect which the evidence showed was not discovered by "the most rigid scrutiny." But in deciding that case the Court, by Justice Magie, said very much that is applicable to our case: "There was no pretense in this case that the company had been guilty of any willful wrong to Kelly. His claim was, and is, that the injury he received was the result of a breach of a duty which the company owed him. The better view of a master's duty to a servant is that which, taking into consideration the well-settled doctrine that a servant, by accepting employment, consents to take the risk of all dangers obviously or naturally incident to such employment, imposes on the master a positive duty to take reasonable care and precaution not to subject the servant to other or greater dangers. The rule thus formulated is of wide application, but, with reference to such (293) *Page 246 
cases as that now under consideration, may be thus stated: The master must take reasonable care to have the tools and appliances with which, and the places on or about which, the servant is to be employed, reasonably safe for the work the latter is employed to do. Shear Red. Negl., secs. 92, 93; Smith M. S. 236; Harrison v. R. R. Co., 2 Vroom, 293; Hutchinson v.R. R., 5 Exch., 343. Applying the rule thus stated to the case before us, it is obvious that, to justify the submission to the jury of the liability of the company to Kelly, the facts established must have warranted the inference that the breaking of the pole, which was the cause of his injury, resulted from a breach of the company's duty to him in respect to that pole. The company did not guarantee the safety of the pole, nor was it the duty to provide a sufficient pole, as was erroneously held below. Its duty was less extensive and would have been satisfied if it had taken reasonable care to provide a pole of sufficient strength to bear the strain of the wires and the weight of the servant employed thereon to do what was required to fit them for the service of the company."
While there is no evidence in this case upon the question whether the company made any inspection or not, the court virtually told the jury that it was not its duty to do so, if plaintiff was an experienced lineman (of which there was no doubt), and the duty of inspection was his, provided the pole was not originally defective. This instruction was, in our view, favorable to the defendant, because it made its duty "less extensive" than in law it really was. The city was required to inspect its poles at reasonable intervals of time, for the safety of its employees and the public, as we have shown, and its failure to do so was negligence, and nothing appears in the evidence to show that it was not the proximate cause of the injury. If it had made the proper inspection, the rottenness of the pole below the surface of the ground could easily have been discovered, for the wood was so badly decayed that it would crumble in the hand under the slightest pressure. Edison Co. v.Street Railway Co., 17 Texas Civil App., was a case in which it appeared that one Dixon, the appellee, who was a lineman or repairer, (294) was injured by the falling of a pole belonging to another company, but used, with its permission, by the defendant, appellant. The pole proved to be rotten near its base and broke in two and Dixon fell with it to the ground and was injured. In an elaborate opinion, the Court reviews the facts and the law, and comes to this conclusion: "Where the defect in the materials or resources of the work are obvious and known to the servant, or he had the same opportunities of knowing that the master had, and he is injured by reason of such defects, he cannot recover, for the reason that he assumed the *Page 247 
risk in undertaking the work. But where, as in this case, the master could, by the use of ordinary care in testing the condition or strength of the pole, have ascertained its defect, and its defect was not known to appellee, and was obvious to him, the master is guilty of a breach of duty to his servant, and is liable for the consequences of it." The following facts, among others, were found by the lower court in that case: "On 28 December, 1895, appellee, J. W. Dixon, with other hands, was employed by appellant to take down and remove a feed wire from the poles on the west side of Pine Street and put the same in a new position. on its poles on the east side of that street. It was necessary for the appellee, in the pursuance of his employment, to climb the poles for the purpose of detaching the feed wire from the brackets to which it was attached, and for that purpose he climbed one of the poles on the west side of Pine Street, and while engaged in loosening the feed wire from the brackets at the top of the pole, it broke near its lower end, and appellee was thereby with great force and violence thrown upon the ground and seriously injured. The place where the pole broke was rotten at and from its center near to its circumference, the unsound part at that place being surrounded only by a thin shell of sound wood, through which hacks had been cut before the pole was erected. On account of its rottenness, the pole was unfit and unsafe for the purpose for which it was used, and too weak to sustain appellee's weight in the performance of his duty in taking down the wire. Its defective condition was not obvious or patent to the eye, and appellee was unaware of it. By the exercise of ordinary care and inspection, which it was appellant's duty to appellee to perform, it could, by testing (295) the pole in the ordinary manner, have ascertained its defects and known the danger to any one in discharging the duty it had employed the appellee to perform." The Court held that "In failing to discharge its duty in inspecting and ascertaining the defect in the pole, which it could have done by the use of ordinary care, it was negligent, and this negligence was the proximate cause of appellee's injury. The appellee was guilty of no negligence contributing in any way to the accident." This judgment, as we have seen, was affirmed on appeal.
In Telegraph Co. v. Wonghter, 56 Ark. 206, the Court held, upon a state of facts much like those in this case, that it was the duty of the defendant (plaintiff in error) to have used reasonable care and diligence by an inspection to discover latent defects, and if ascertained to exist, then to warn its employee of the probable danger in ascending the pole. These are the words of the Court: "While he does not insure the safety of his servants, yet he is bound to take heed that he does not, through his own want of care and prudence, expose them to unreasonable risks or *Page 248 
dangers, either from the character of the tools with which he supplies them or the place in which he requires them to operate. He is in duty bound not to expose them to danger of which he knows or has reason to know they are not aware. Before ordering them to perform any service, he should warn them fully of the latent dangers incident thereto, if there be any, of which he knows, or in the exercise of proper diligence ought to know; and this duty `extends even to patent dangers when he knows the servant, by reason either of his youth or his inexperience, is not aware of the danger to which he is exposed, or . . . which are unknown to the servant from any cause, and which cannot readily be ascertained except by a person possessed of peculiar knowledge, which he has no reason to suppose the servant possesses,'" citing many authorities. The appellate Court awarded a new trial in that case, because the instruction of the lower court made it the absolute duty of the company to discover the defect, without any regard to the question of care or diligence in attempting to do so.
(296) Unless we hold that the duty of seeing that this pole was in proper condition rested upon the plaintiff Terrell (and we have shown that the contrary is the true rule), Ward v. Telegraph Co.,71 N.Y. 81, is in point, and is to this effect: "The defendant had the right to place its line in the street, and hence it can be made responsible for the accident only by proof of culpable negligence on its part, either in the construction of the line or its maintenance. If the post which broke and fell was originally not reasonably sufficient, or if it was permitted carelessly to become and be insufficiently by decay, then responsibility attaches to the defendant for the accident."
Applying the law to facts similar to those in this case, the Court inMcGurie v. Telephone Co., 167 N.Y. 208, said: "If the pole had injured a passer-by, it would be no answer for the defendant to say that it did not own the pole. It was bound, both as to third parties and as to its own workmen, to erect and maintain a reasonably safe structure, and it had no right to use for that purpose an unsafe appliance, whether its own or that of a third party. By using the pole as part of its line, it adopted it as its own. As it would have been liable had the pole when first used been decayed and insufficient for the purpose of carrying its wires and supporting its linemen, it was equally liable when the pole subsequently became unsafe from decay, which reasonable inspection would have discovered. The duty of the defendant was just as great to safely maintain as to safely construct, and that duty cannot be delegated so as to exempt the master from liability." As said by the Court in the case just cited, "If each lineman was to dig around and test every pole before he ascended it, a large part of his time would be taken up *Page 249 
by this work alone, and repeated tests would soon impair the stability of the pole itself"; and from this consideration it was deduced by the Court that the advantage to the company in undertaking itself to make the inspection is plain.
There are authorities in other jurisdictions which hold that it is the lineman's duty to make the inspection, but the ruling in most of them if not all of them was influenced by facts or considerations not applicable to the case at bar. The uncontroverted proof shows conclusively, we think, that the pole was not originally sound, and consequently (297) not safe. In fact, we do not see why a casual inspection in the beginning would not have discovered its defective condition, for it had scarcely survived one-sixth of its allotted span of life, and when it was broken, it had become decayed and rotten almost entirely through its base. The lineman had no reason whatever to suspect its bad condition and was not required by his contract or any custom or usage to inspect the pole before he climbed it to adjust the wires, but had every right to rely upon the original careful selection and inspection of his employer.Clairain v. Telegraph Co., 40 La. 178; McDonald v. Telegraph Co.,22 R. I., 131.
We conclude, therefore, that the motion of the defendant to nonsuit the plaintiff was properly overruled, and that there was no error in refusing the peremptory instructions it requested, to find for the defendant. There was evidence that the pole had not been inspected by defendant; that it fell three years after it was first set in the ground, when it should have lasted from six to sixteen or twenty years; that its condition, on inspection after it fell, was found to be very bad, it being rotten to the core; that the strain on it was apparently not sufficient to have broken a sound pole. These and other facts and circumstances, of which there was some evidence, were sufficient to carry the case to the jury, it being a primary and nondelegable duty of the master to see that his servants are not subjected to unnecessary risk or hazard by any failure on his part, in the exercise of due and proper care, to furnish a plant with instrumentalities adapted to the performance of the work, and reasonably sound, safe, at least in original structure; and this the defendant failed to do.
One other question calls for notice. The defendant alleged that the claim of the plaintiff had not been presented within the time fixed by its charter. But the jury have found, under proper instructions, that by reason of his injuries, which affected him both mentally and physically, the plaintiff was unable, during that period, to transact ordinary business or to present his claim, and that he did so within a reasonable time after he was restored sufficiently to do so. This, we think, *Page 250 
(298) excused the delay. The general rule in such cases seems to be that in order to excuse a strict compliance with the provision, it must be shown that there is such physical or mental incapacity as to make it impossible for the injured person, by any ordinary means at his command, to procure service of the notice or a filing of the claim, whichever is required, and if there is an actual incapacity, it can make no practical difference in reason whether it is mental or physical in its nature. Born v. Spokane, 27 Wn. 719; Barclay v. Boslin, 167 Mass. 597. It may very properly be said that it would, in truth, shock the sense of justice and right if this provision was construed so as to hold the notice of the plaintiff's claim insufficient under the circumstances. It is an accepted maxim that the law does not seek to compel that to be done which is impossible. It cannot reasonably be presumed that the intention of the Legislature in exacting this charter would lead to any such unjust conclusion, and it is a fundamental canon of interpretation that a thing which is within the letter of a statute is not within the statute itself, unless it is within the intention of the makers. Waldenv. Jamestown, 178 N.Y. 213. Speaking of a similar statute, the Court said in Forsyth v. Oswego, 191 N.Y. 441: "In the absence of any explanation of plaintiff's delay in this respect, the direction of the statute would have been conclusive and final. There was an explanation, however, and it was for the jury to say whether it was credible and satisfactory. If the plaintiff was, as he claimed, physically and mentally unable to prepare and present his claim, or to give directions for its preparation and presentation during the whole of the three months within which he was required by the defendant's charter to present it, then he was entitled to a reasonable additional time in which to comply with the charter in that regard. This is because the law does not seek to compel that which is impossible." Numerous cases support this reasonable doctrine. Everhardt v. Seattle, 33 Wn. 664; Williams v.Port Chester, 89 N.Y. Suppl. (s. c., 97 A.D. 84 and Aff.,183 N. Y., 550); Webster v. Beaver Dam, 84 Fed., 280; Hungerford v.Waverly, 109 N.Y. Suppl., 438. The Court in Green v. Port Jervis, 66 N.Y. Suppl., 1042, used strong language upon the subject: (299) "The provision of the charter requiring preliminary notice of an intention to sue attaches only, as has been said, as a condition precedent to the commencement of an action against the village, Reiningv. Buffalo, 102 N.Y. 308, 6 N.E. 792; Curry v. Buffalo,135 N.Y., 366, and if compliance with the condition is rendered temporarily impossible by the wrongful act of the defendant, it would be monstrous to allow the defendant to assert that fact as a defense to the action. The requirement of notice necessarily presupposes the existence of an *Page 251 
individual capable of giving it, and not one deprived of that power by the operation of the very wrong to be redressed. That the defendant should be permitted to take advantage of its own wrong is clearly not within the purview of the law." On this branch of the case we decide, upon principles of reason and justice and from high authority, that under the facts as presented the defendant cannot rely upon the failure to give notice of the claim within the time limited as a bar to the action.
The other assignments of error, we think, are without merit.
No error.
Cited: Woodie v. Wilkesboro, 159 N.C. 356; Harrington v. Greenville,ib., 636; Pender v. Salisbury, 160 N.C. 365; Hartsell v. Asheville,164 N.C. 196; Tate v. Mirror Co., 165 N.C. 279; Hartsell v. Asheville,166 N.C. 634.