T. A. HENDERSON v. CITY OF WILMINGTON AND WALTER H. BLAIR, MAYOR, JOSEPH E. THOMPSON AND E. L. WADE, COMMISSIONERS OF THE CITY OF WILMINGTON.

(Filed 3 March, 1926.)

1. **Municipal Corporations—Statutes—"Faith and Credit"—Necessary Expenditures—Courts—Questions of Law.**

Our statutes enumerating certain properties that may be acquired by municipalities are not in conflict with our Constitution, Art. VII, sec. 7, when not specifying that the question of expenditures therefor shall first be submitted to the voters of the community, when the credit of the community is involved therein, it being for the courts, as a matter of law, to decide whether such expenditures come within the constitutional inhibition, or are for a necessary expenditure permitted within its terms. C. S., 2691.

2. **Same.**

Cities and towns may levy a tax for necessary expenses up to the constitutional limitation without a vote of the people and without legislative permission; for necessary expenses they may exceed the constitutional limitation by legislative authority, without the approval of the voters: but for purposes other than necessary, a tax cannot be levied either within or in excess of the constitutional limitation except with the approval of the voters under special legislative authority. Const., Art. V, sec. 6; Art. VII, sec. 7.

3. **Same—Government—Business Advantages.**

The courts in determining whether a proposed issue of bonds by a city is for a necessary expense not requiring the assent of its voters, look to the question of whether the proposed issuance of bonds is for purposes governmental in their scope, and the issuance will be declared unconstitutional when the bonds are for purposes relating only to the business advantages to be derived by the community.

4. **Same—Acquisition of Wharves and Terminals.**

Without the approval of its voters, a city is inhibited by Art. VII, sec. 7, from issuing bonds for the acquisition of free "wharves or terminals" that may be of advantage to its local business interests. The distinction is drawn between the consideration of the question of a necessary expense for keeping up wharves and terminals already owned or acquired.

5. **Same—Ordinances—United States Government Contracts.**

Under the facts of this case: *Held*, that the declaration in the ordinance that the wharf and terminal facilities proposed to be acquired were for a necessary expense under a deed to the property given by the agency of the United States Government conditioned upon their acquisition and maintenance, does not affect the question of its constitutionality as determined by the courts.

CLARKSON, J., dissenting.

APPEAL by the defendants from a judgment of *Daniels, J.,* rendered at Chambers on 30 November, 1925.

This is a controversy without action upon the following statement of facts:

1. Plaintiff, T. A. Henderson, is a citizen, resident and taxpayer of the city of Wilmington, State of North Carolina.

2. The defendant, city of Wilmington, is a municipal corporation, duly created under the laws of the State of North Carolina. The defendant, Walter H. Blair, is mayor of said city, and the defendants, Joseph E. Thompson and James E. L. Wade, are commissioners of said city.

3. On 18 November, 1925, the board of commissioners of the city of Wilmington, passed an ordinance providing for the issuance of bonds not to exceed the amount of $100,000, pursuant to the Municipal Finance Act. After the introduction and before the final passage of said ordinance, an officer designated by the board of commissioners for that purpose, made and filed with the clerk of said city, the statement it appeared that the net debt of the city of Wilmington, including the said $100,000 of bonds, did not exceed 8 per cent of the assessed valuation of property in said city, as last fixed for municipal taxation. Said ordinances were published in a newspaper published in the city of Wilmington, in accordance with law. The said ordinance is in words and figures as follows:

*"An Ordinance Authorizing the Issuance of Bonds for the Construction of Public Municipal Docks and Terminals:*

"Be it ordained, by the board of commissioners of the city of Wilmington, North Carolina, and it is hereby ordained by authority thereof as follows:

SECTION 1. Pursuant to the Municipal Finance Act, bonds of the city of Wilmington are hereby authorized to be issued in an aggregate principal amount not exceeding $100,000 for the purpose of paying the cost of constructing public municipal docks and terminals at or near the property known as the Old Liberty Shipyard, on the Cape Fear River, said public docks and terminals to be used for the purpose of shipping, both foreign and coastwise.

"SEC. 2. A tax sufficient to pay the principal and interest of said bonds shall be annually levied and collected.

"SEC. 3. It is hereby determined, pursuant to the requirements of the Municipal Finance Act, that a statement of the debt of the city of Wilmington has been filed with the city clerk, and is open to public inspection.

"SEC. 4. It is hereby determined that all expenses to be defrayed by means of the bonds hereby authorized are necessary expenses of the city of Wilmington, within the meaning of section 7, Art. VII, of the Constitution of North Carolina.

"SEC. 5. This ordinance shall be published once in each of the two successive weeks after its final passage.

"SEC. 6. This ordinance shall take effect thirty days after its first publication, unless in the meantime, a petition for its submission to the voters is filed under the Municipal Finance Act, and in such event it shall take effect when approved by the voters of the city of Wilmington, at an election as provided in said act."

4. The defendants will, unless restrained by an order of this court, proceed at once to issue $100,000 of bonds of the city of Wilmington as provided for in said ordinance, for the purpose therein expressed, without a vote of a majority of the qualified voters of said city, and the question of issuing said bonds for such purpose has not been submitted to the voters of said city at an election.

5. The defendant, city of Wilmington, is the owner of a certain tract of land lying partly within, and partly without, the city limits, and having considerable river front, which property was formerly known as the Liberty Shipyard, and was conveyed to the city of Wilmington by the United States Shipping Board Emergency Fleet Corporation, upon certain terms and conditions hereinafter more fully set out. That said tract of land constitutes the only available water front at or near the city of Wilmington, on which public docks and other terminal facilities can be erected. That while private interests have constructed adequately equipped docks and terminals on the river at, and near, the city of Wilmington, and although such terminals may be operated under publicly regulated charges, the existence of publicly owned docks and terminals is necessary to insure that equality of facilities and service, which is demanded by the shipping interests.

6. That the city of Wilmington is largely dependent for its material welfare and progress upon the proper development of its port, and that in order for said city to compete with other coastal cities on the South Atlantic Seaboard, it is necessary for said city to offer to shipping interests adequate publicly owned docks and terminal facilities.

7. The United States Board of Engineers has adopted a rule requiring municipalities to make adequate provision for utilizing waterway development, such as docks and other terminal facilities, as a condition precedent to the approval of water-way development projects.

8. There are at present, two major water-way development projects for the Port of Wilmington, viz.: a thirty-foot depth, with a 400-foot

channel from the bar to the city, and the construction of the inter-coastal water-way from Beaufort to the Cape Fear River, and that the construction of public municipal docks and terminal facilities as provided for in said proposed bond issue is calculated to materially aid in the securing of both of these projects.

9. That on 11 September, 1920, the United States Shipping Board Emergency Fleet Corporation, by deed duly executed, conveyed to the city of Wilmington, the lands and premises hereinabove referred to and upon which it is proposed to construct said public municipal docks and terminals. Said deed is in words and figures, in part, as follows:

"DISTRICT OF COLUMBIA⎫
"CITY OF WASHINGTON⎬ SS.

"Indenture made and executed this the eleventh (11th) day of September, A.D. nineteen hundred twenty (1920), by and between the United States Shipping Board Emergency Fleet Corporation, a corporation organized and existing under the laws of the District of Columbia, representing and acting for the United States of America, (herein called the grantor), party of the first part, and the city of Wilmington, of the State of North Carolina, a municipal corporation, (herein called grantee), party of the second part:

"Whereas, the said grantee, during the year nineteen hundred eighteen (1918), was instrumental in procuring the donation to the grantor of the land or real estate hereinafter described; and,

"Whereas, the inducement to the said grantee was the location and maintenance by the said grantor of a shipyard at or near the city of Wilmington, in the State of North Carolina, and,

"Whereas, the grantor has ceased to operate the shipyard upon said real estate; and,

"Whereas, it is desired, as a matter of public policy, that the grantor shall assist in the maintenance of ports and terminals upon the eastern seaboard of the United States, as enjoined upon it by law; and,

"Whereas, the grantee is willing to accept a conveyance of said land or real estate subject to a condition to maintain perpetually free port and terminal facilities upon the real estate hereinafter described; and,

"Whereas, at a meeting duly held by the board of trustees of the grantor, said United States Shipping Board Emergency Fleet Corporation, in the city of Wilmington, District of Columbia, on the eleventh (11th) day of September, nineteen hundred twenty (1920), the following resolution was unanimously adopted by said board of trustees:

(Here follows resolution.)

"Now, therefore, this indenture witnesseth: That the said grantor, in consideration of the premises and in further consideration of the sum of thirty-seven thousand five hundred dollars ($37,500), in hand paid by the grantee, the receipt whereof is hereby acknowledged, has granted, sold, conveyed, and confirmed, and by this indenture does hereby grant, bargain, sell, convey and confirm to the city of Wilmington, the following described real estate, to wit: (Here follows description of property.)

To have and to hold the aforegranted and above described parcels of land, together with all the appurtenances and rights, unto the said grantee and its successors and assigns forever, upon condition, however, that the said grantee, its successors and assigns, will, within ten (10) years from the date of this instrument, create and erect upon such portion of said real estate as is appropriate and necessary therefor, free port and terminal facilities, and will, from and after the expiration of said term of years, perpetually and continuously maintain upon said real estate such free port and terminal facilities, and the further condition that whenever said grantee, its successors and assigns, shall fail to keep and maintain, after the expiration of said term of years, free port and terminal facilities upon said land or real estate, then, and in that event, the said land or real estate shall revert to, and the title shall vest in, the grantor, or, if the grantor is not then in existence, to the United States Shipping Board, or, if the United States Shipping Board is not then in existence, to the United States of America, and the said grantor, for itself and its successors, hereby covenants and agrees to and with the said grantee, its successors and assigns, to warrant and defend the title to the above described tracts or parcels of land against the lawful claims of all persons."

10. That there are no funds available for the construction of said docks and terminals except the proceeds of the proposed bond issue, and that unless said docks and terminals are constructed by the city of Wilmington, within the time limited in said deed, the real estate therein conveyed to the city of Wilmington, will, under the terms thereof, revert to the grantor and the defendant, city of Wilmington, will be divested of all interest or estate therein.

11. The plaintiff maintains that the issuance of said bonds as aforesaid, will be unlawful for the reason that the issuance of said bonds would be in violation of section 7, Art. VII, of the Constitution of North Carolina, which declares that no town shall contract a debt, or levy a tax, except for the necessary expenses thereof, unless by a vote of the majority of the qualified voters therein, that the construction of public municipal docks and terminals on the lands and premises referred to, is

not a necessary expense within the meaning of said section of the Constitution of North Carolina, and that, therefore, the issuance of bonds for said purpose, without first obtaining the approval of the voters of said town as required by said section of the Constitution will be unlawful.

12. On the other hand, the defendants maintain that the issuance of said bonds as aforesaid will not be unlawful for the reason that the construction of public municipal docks and terminals, is a necessary expense within the meaning of section 7, Art. VII, of the Constitution of North Carolina, and that, therefore, said bonds may be lawfully issued without submitting the same to a vote of the people and obtaining a vote of the majority of the qualified voters.

13. The plaintiff maintains that upon the foregoing facts, he is entitled to judgment restraining and enjoining the defendants from issuing said bonds. The defendants maintain that the issuance of said bonds as aforesaid, should not be enjoined.

14. It is agreed, that if, upon the foregoing facts, the court shall be of the opinion that said bonds, or any of them, will be invalid, judgment shall be rendered enjoining and restraining the defendants from issuing said bonds.

Judge Daniels was of opinion that while all the requirements of the Municipal Finance Act of 1921 had been complied with, the purpose for which the bonds are to be issued does not constitute a necessary expense of the city of Wilmington within the meaning of Art. VII, sec. 7, of the Constitution of North Carolina, and that said bonds cannot legally be issued without submitting the question to a vote of the people as provided in Art. VII, sec. 7, and restrained and enjoined the defendants from issuing the bonds under the ordinance set out in the agreed case. The defendants excepted and appealed to the Supreme Court.

*Bryan & Campbell for plaintiff.*
*K. O. Burgwin for defendants.*

ADAMS, J. The Constitution, Art. VII, sec. 7, provides: "No county, city, town or other municipal corporation shall contract any debt, pledge its faith or loan its credit, nor shall any tax be levied or collected by any officers of the same except for the necessary expenses thereof, unless by a vote of the majority of the qualified voters therein." The necessity of a rigid observance of this provision has been pointed out and reiterated in our decisions and emphasized by special legislative enactment. C. S., 2691. In analyzing and construing this section in its relation to the sixth section of Article 5, the Court has held: (1) That for necessary

expenses the municipal authorities may levy a tax up to the constitutional limitation without a vote of the people and without legislative permission; (2) that for necessary expenses they may exceed the constitutional limitation by legislative authority, without a vote of the people; (3) that for purposes other than necessary expenses a tax cannot be levied either within or in excess of the constitutional limitation except by a vote of the people under special legislative authority. *Herring v. Dixon*, 122 N. C., 420; *Tate v. Comrs.*, 122 N. C., 812.

The qualified voters of the city have had no opportunity to express their will on the far-reaching question of building docks to be used in "shipping, both foreign and coastwise," and there is no pretense that the indicated tax will be within the constitutional limitation. Therefore the bonds can be issued and the tax levied, if at all, only upon the principle stated in the second class,—that is, that the bonds are authorized by the Legislature and are to be issued for a necessary expense of the city. It is provided by statute that any city shall have the right to acquire, establish and operate waterworks, electric lighting systems, gas systems, schools, libraries, cemeteries, market-houses, wharves, play or recreation grounds, athletic grounds, parks, abattoirs, sewer systems, garbage and sewage disposal plants, auditoriums or places of amusement or entertainment, armories, rest rooms, a system of public charities, etc., and that reasonable appropriations for these purposes shall be "subject to the provisions of the Constitution of the State." C. S., 2832. That is, if the purpose involves a necessary expense, as, for example, a market-house or a municipal lighting system, the assent of the qualified voters is not essential; but if the purpose does not involve a necessary expense, as, for instance, a hospital or place of amusement, the will of the voters must be ascertained. It is also provided that for certain of these purposes land may be acquired by purchase or condemnation. C. S., 2791, 2792; Laws 1917, ch. 136, subch. 4, sec. 1; Laws 1919, ch. 262.

The constitutionality of these acts is not in question. The Legislature has not said that the purposes enumerated involve a necessary expense (although some, but not all, do); for this is a question of law. Since the appropriations are "subject to the provisions of the Constitution" they must conform to the Constitution; and for this reason there is no conflict between the statute and the organic law.

The bonds are to be issued for the purpose of constructing "public municipal docks and terminals." Neither the word "docks" nor the word "terminals" appears in the statute we have cited; and "wharves," which is found in the statute, does not appear in the ordinance. But we make no point on the technical distinction between a "dock," a "wharf"

and a "terminal"; we grant for the present purpose only that "wharves" may be treated as synonymous with or at least as including "docks and terminals." It will be conceded, we presume, that a municipality may not engage in the business of erecting wharves or docks unless expressly authorized by its charter or by statute. This principle is elementary. If the statute (C. S., 2832) authorizes the defendants to acquire, establish, or operate a wharf, it also prescribes a definite constitutional limitation under which the authority may be exercised; and if the statute had not prescribed it, the Constitution has. This limitation is "a vote of the majority of the qualified voters" in the city, unless the construction of the proposed wharf or dock is a necessary municipal expense. Whether it is a necessary expense within the meaning of the Constitution is the question to be determined.

With the mere utility of the enterprise we are not concerned. Whether "shipping, foreign and coastwise" would expand commerce is alien to the principle we are considering. The convenience, the benefit to be conferred upon a particular class, the insufficiency of present facilities, and a want of opportunity for commercial or industrial competition—these and similar premises are not factors that can control or even contribute to our solution of the present controversy. We are dealing exclusively with a question of law, with the legal formalities necessary to pledging the faith of the city by issuing bonds for the contemplated purpose; and as these formalities are mandatory they may not be disregarded or ignored.

It is admitted, we understand, that the term "necessary expense" includes law and fact, and, as used in the Constitution and in contracts purporting to incur municipal indebtedness, that it involves matters, not for legislative, but for judicial determination. *Storm v. Wrightsville Beach,* 189 N. C., 679; *Black v. Comrs.,* 129 N. C., 121; *Mayo v. Comrs.,* 122 N. C., 5, overruled on another point in *Fawcett v. Mt. Airy,* 134 N. C., 125. This is recognized by the Legislature in its statutory definition of "necessary expenses" as the necessary expenses referred to in Art. VII, sec. 7, of the Constitution. 3 C. S., 2919. Also in the provision: "If a bond ordinance provides for the issuance of bonds for a purpose other than the payment of necessary expenses of the municipality, the approval of a majority of the qualified voters of the municipality as required by the Constitution of North Carolina, shall be necessary in order to make the ordinance operative." 3 C. S., 2948. It is plain, then, that neither the finding of the defendants (as stated in the fourth section of their ordinance) that the expenses to be defrayed are necessary expenses, nor the rule, adopted by the United States Board of Engineers requiring municipalities to make adequate provision for utilizing docks and other terminal facilities, nor yet any executory provision in the deed of the United States shipping board Emergency Fleet

Corporation can have the least bearing or influence upon our interpretation of the constitutional provision.

In defining "necessary expense" we derive practically no aid from the cases decided in other States. We have examined a large number of such cases apparently related to the subject and in each one we have found some fact or feature or constitutional or statutory provision antagonistic to or at variance with the section under consideration. We must rely upon our own decisions.

In *Wilson v. Board of Aldermen,* 74 N. C., 748, 759, *Rodman, J.,* said that it would be difficult, if not impossible, to draw a precise line between what are and what are not the necessary expenses of the government of a city; and in *Fawcett v. Mt. Airy,* 134 N. C., 125, *Montgomery, J.,* remarked that it would be almost impossible to state in legal phraseology the meaning of the words "necessary expense" as applied to the wants of a city or town government. The definition given in *Jones v. Comrs.,* 137 N. C., 579, 599, indicates less restraint and less doubt. There it is said by *Hoke, J.,* "They (necessary expenses) involve and include the support of the aged and infirm, the laying out and repair of public highways, the construction of bridges, the maintenance of the public peace and administration of public justice—expenses to enable the county to carry on the work for which it was organized and given a portion of the State's sovereignty." In a subsequent decision the same writer observes that the term more especially refers to the ordinary and usual expenditures reasonably required to enable a county properly to perform its duties as a part of the State government. *Keith v. Lockhart,* 171 N. C., 451, 456. This feature is again stressed in *Ketchie v. Hedrick,* 186 N. C., 392, in which the late *Chief Justice Clark* said: "But all these cases extending the meaning of the words, "necessary expenses," were due to the enlarged scope of governmental expenses, causing a broader vision and very proper growth in the recognized needs and requirements of municipal government. They were not based upon any idea that "necessary expenses" would take in matters which were not required as necessary governmental expenses."

By virtue of this interpretation it has been held that among necessary expenses may be classed those incurred by a city or town for streets, lights, water, sewerage, a fire department, an electric fire-alarm, an incinerator, a municipal building, a markethouse, a jail or guard-house, and jetties for the protection of a village bordering on the water; and among expenses not necessary may be grouped those for schools and schoolhouses (see, however, *Collie v. Comrs.,* 145 N. C., 170), hospitals, rights of way for railroads, and manufacturing, industrial, and commercial enterprises. *Storm v. Wrightsville Beach, supra;* and cases cited; *Brown v. R. R.,* 188 N. C., 52; *Ketchie v. Hedrick, supra;*

*Armstrong v. Comrs.,* 185 N. C., 405; *Williams v. Comrs.,* 176 N. C., 554; *Stephens Co. v. Charlotte,* 172 N. C., 564; *Keith v. Lockhart, supra; Sprague v. Comrs.,* 165 N. C., 603.

The cases declaring certain expenses to have been "necessary" refer to some phase of municipal government. This Court, so far as we are advised, has given no decision to the contrary. *Hartsfield v. New Bern,* 186 N. C., 136, is not in conflict with this position. There the question of levying a tax or pledging the credit of the city did not arise. Article VII, sec. 7, of the Constitution was not construed or discussed; it was not referred to in the opinion. In that case the plaintiffs sought to enjoin the city of New Bern from acquiring an easement in a strip of land about twenty feet in width extending from the tracks of the Atlantic and North Carolina Railroad to Union Point; and they based their suit upon the allegation that the act of the Legislature giving the city the right of eminent domain was a private act passed without the preliminary notice of thirty days and without evidence of three several readings on three different days. Const., Art. II, secs. 12, 14. Upon this question the appeal was prosecuted; not upon that of levying a tax or pledging the credit of the city. The reference in the reported case to municipal wharves as "public necessities" appears incidentally in the preliminary statement. It is not a part of the opinion; so it cannot be accepted as a precedent or as the expression of the Court. The controversy had reference to the exercise under legislative grant of the city's alleged right to condemn the plaintiffs' land to enable a railroad built principally by the State and certain counties, including Craven, to extend its track to the water front.

In *Scales v. Winston-Salem,* 189 N. C., 469, the plaintiff asked damages for personal injury alleged to have resulted from the negligent construction of an incinerator. In pointing out the distinction between acts done for the private benefit of the city and those done in the performance of a governmental power, we quoted from the opinion in *Moffitt v. Asheville,* 103 N. C., 237, 254, in which *Avery, J.,* said: "The grading of streets, the cleansing of sewers, and keeping in safe condition wharves from which the corporation derives a profit are corporate duties." In *Moffitt's case* and in *Scales' case,* the question was that of the defendant's liability for negligence; neither has anything to do with Art. VII, sec. 7, of the Constitution. There are many "corporate duties" which are utterly remote from those relating to necessary expenses. The duty of keeping a wharf in safe condition after the city has lawfully established or acquired it is altogether separate and distinct from obedience to the mandate that a wharf shall not be established or acquired by pledging the city's credit or levying a tax without the assent of the qualified voters. In *Adams v. Durham,* 189 N. C., 232, it was

held that the building of an auditorium for the convenience of the city, while not a necessary expense, was a public purpose, and that the city authorities could use money already on hand in the erection of such building. *Chief Justice Hoke* remarked that Art. VII, sec. 7, did not apply because the expenditure would impose no further liability and would require no further taxation. Suppose the city of Wilmington had in its treasury money enough to construct the proposed docks and with this money should build them and use them for a profit; or, suppose the qualified voters should approve the sale of the bonds and the levy of a special tax and out of the proceeds the city should build the docks and use them for a profit; in either event it would be incumbent upon the city to keep the docks in repair and a negligent failure to perform this "corporate duty" would lay the foundation of a suit in damages, as in case of failure to perform any similar corporate duty whether the "purpose" did or did not originally involve necessary expense. This principle is not new: it is upheld in a number of our decisions. *Fisher v. New Bern,* 140 N. C., 506; *Harrington v. Wadesboro,* 153 N. C., 437; *Terrell v. Washington,* 158 N. C., 281; *Woodie v. North Wilkesboro,* 159 N. C., 353; *Harrington v. Greenville, ibid.,* 632.

But none of these cases decides the specific question under review. The decisions heretofore rendered by the Court make the test of a "necessary expense" the purpose for which the expense is to be incurred. If the purpose is the maintenance of the public peace or the administration of justice; if it partakes of a governmental nature or purports to be an exercise by the city of a portion of the State's delegated sovereignty; if, in brief, it involves a necessary governmental expense—in these cases the expense required to effect the purpose is "necessary" within the meaning of Art. VII, sec. 7, and the power to incur such expense is not dependent on the will of the qualified voters. Now, for what purpose are the bonds to be issued and the tax levied? As previously indicated, to build docks and terminals "to be used for the purpose of shipping, both foreign and coastwise." Ordinance, sec. 1. This is primarily a business venture; and as such it is unrelated to the administration of justice or to any governmental function; it does not involve a "necessary expense." The power to tax is restricted; and the Constitution has wisely ordained that a municipal corporation shall not without the assent of a majority of the qualified voters levy a tax in aid of an enterprise of this character. The proposed undertaking is local. If it were an enterprise upon which the whole State had embarked a different question might arise; for the Court has held that the restrictions contained in Art. VII, sec. 7, are confined to local measures and do not include those which affect the entire commonwealth. *Bank v. Lacy,* 183 N. C., 373; *Lovelace v. Pratt,* 187 N. C., 686.

The defendant reminds us, as suggested in *Storm v. Wrightsville Beach, supra,* that we should "look for better moral and material conditions and governmental machinery to provide them." We may also admit the force of the statement that "the luxuries of one generation have become the necessities of another." *Swindell v. Belhaven,* 173 N. C., 2. Nor are we inadvertent to the cases, long since overruled, in which it was held that expenses incurred for lights and water were not "necessary." *Mayo v. Comrs., supra; Thrift v. Elizabeth City,* 122 N. C., 31. But we must not lose sight of the fact that each of these progressive changes was governmental in its nature. Upon the same principle conditions are conceivable in which the establishment of a wharf might be deemed to involve a necessary expense; but in this case such conditions do not appear.

The proposed bonds are not required as a necessary governmental expense and cannot be issued under the ordinance adopted by the defendants. The judgment is

Affirmed.

CLARKSON, J., dissenting: The facts substantially agreed upon in the submission of controversy succinctly are as follows:

On 11 September, 1920, the defendant, city of Wilmington, purchased from the United States Shipping Board Emergency Fleet Corporation, a large tract of land located near the southern boundaries of the city, partly within the city limits, and partly without, and on the river front. The deed conveying the property is set out, in part, in the main opinion. Under its provisions the city of Wilmington agrees, within a period of ten years, to "create and erect upon such portion of said real estate as is appropriate and necessary therefor free port and terminal facilities," and to continuously maintain such free port and terminal facilities. The deed further stipulates that upon the failure of the city, the grantee, to comply with these provisions, within the time limited, title to the real estate conveyed will revert to the grantor, and that the grantee will thereupon be divested of all right, title and interest thereto. The purchase price of this property was $37,500. The city of Wilmington is located on the Cape Fear River thirty miles above the mouth of the river. The river from its mouth to, and for some distance beyond, the city of Wilmington, has a thirty-foot channel. The Port of Wilmington is well adapted for a distributing port for water-borne commerce, except that it has no adequate port or terminal facilities, such as are demanded by the shipping interests, and such as are in keeping with other ports on the South Atlantic Seaboard. Not being an industrial center, the city of Wilmington depends, in a large measure, for its material and commercial welfare, upon its development as a

port. This development is retarded by its present failure to offer adequate port and terminal facilities. Under present conditions, it cannot successfully compete with other South Atlantic Ports which have publicly owned facilities of this nature. In order to remedy these defects, and in order to develop the city to the point where it was logically intended that it should be developed, and thereby increase its commercial and material welfare, the governing authorities of the city now propose to issue bonds in the aggregate amount not to exceed $100,000, for the construction of publicly owned ports and terminals, to be located on the premises referred to in the deed set out in the record. The only question presented in this appeal is as to whether or not such an expenditure is a "necessary expense" within the meaning of Art. VII, sec. 7, of the Constitution of North Carolina.

In the main opinion it is said: "The necessity of a rigid observance of this provision (Art. VII, sec. 7, of the Const., of N. C.), has been pointed out and reiterated in our decisions and emphasized by special legislative enactment," and cites C. S., 2691, which is as follows: "No county, city, town or other municipal corporation shall contract any debt, pledge its faith or loan its credit, nor shall any tax be levied, or collected by any officer of the same, except for the necessary expenses thereof, unless by a vote of the majority of the qualified voters therein." This is in C. S., under "General Municipal Debts," and the exact language of Art. VII, sec. 7, of the Constitution.

On the contrary, the constructive thought of the State is ever bending to beneficial necessities. For example, in *Mayo v. Washington,* 122 N. C., p. 5 (1898—Electric Light Plant) and *Thrift v. Elizabeth City,* 122 N. C., p. 31 (1898—Waterworks), were held not a "necessary expense," and a vote of the people was necessary. In *Fawcett v. Mt. Airy,* 134 N. C., 125 (19 December, 1903), these cases were overruled, and water and light were held to be a necessary expense.

In *Herring v. Dixon,* 122 N. C., 422, the very case cited in the main opinion: An injunction was sought by plaintiff, suing on behalf of himself and other taxpayers of Greene County, against defendant, sheriff of Greene County, contending that the road act was unconstitutional and the tax was uncollectible. The lower court granted the injunction, this Court held error and said: "There has long been a feeling that the system of working roads entirely by a levy upon labor, without any taxation upon property, was unsatisfactory in its results, and with many there has been a conviction of its unfairness. The present act is, at any rate, an outcome of what is known as the *'Public Roads Improvement'* movement, which originating, as far as this State is concerned, in a statute somewhat similar to this, enacted for the county of Mecklenburg, has, with more or less modification, been since enacted for a great many

other counties; the features common to all being largely the working of the public roads by taxation in lieu of the conscription of labor, and further in utilization of convicts, who formerly lay idle in jail. *Working the roads being a necessary expense,* the courts are incompetent, under the authorities, to interfere with the manner and expense of working them, unless the total levy exceeds the constitutional limitation or the equation is not observed." This decision holding the road act constitutional, was saving "Good Road Movement" in the State. The other case—*Tate v. Comrs.,* 122 N. C., p. 812, is to the same effect and upholds the road act. The Court lays down in both decisions the three propositions set forth in the main .opinion for taxation guidance, which is well settled law. In *Storm v. Wrightsville Beach,* 189 N. C., p. 681, jetties were held necessary expenses, it was said: "The question, what is a necessary expense, which is a judicial one for the courts to determine, is one that cannot be defined generally so as to fit all cases which may arise in the future. *As we progress, we look for better moral and material conditions and the governmental machinery to provide them.* 'Better access to the good things of life for all people,' safety, health, comfort, *convenience in the given locality.* Webster defines necessary: 'A thing that is necessary or indispensable to some purpose; something that one cannot do without; a requisite; an essential.' What is necessary expense for one locality may not be a necessary expense for another. *Fawcett v. Mt. Airy,* 134 N. C., p. 125; *Keith v. Lockhart,* 171 N. C., p. 451. . . . *The term in the Constitution 'necessary expense,' is not confined to expenses incurred for purposes absolutely necessary to the very life and existence of a municipality, but it has a more comprehensive meaning.* It has been held in this jurisdiction that streets, waterworks, sewerage, electric lights, fire department and system, municipal building, markethouse, jail or guard house are necessary expenses. *McLin v. New Bern,* 70 N. C., 12; *Fawcett v. Mt. Airy, supra; Greensboro v. Scott,* 138 N. C., 181; *Comrs. v. Webb,* 148 N. C., 122; *Hightower v. Raleigh,* 150 N. C., 569; *Bradshaw v. High Point,* 151 N. C., 517; *Jones v. New Bern,* 152 N. C., 64; *Underwood v. Asheboro,* 152 N. C., 641; *Hotel Co. v. Red Springs,* 157 N. C., 137; *Robinson v. Goldsboro,* 161 N. C., 668; *Gastonia v. Bank,* 165 N. C., 511; *Leroy v. Elizabeth City,* 166 N. C., 93; *Power Co. v. Elizabeth City,* 188 N. C., 296."

The Municipal League of the State had a committee to present to the Legislature of North Carolina at its session in 1917, a comprehensive upbuilding act for municipalities, the main features are embodied in chapter 136, Pub. Laws 1917, entitled "An act to provide for the organization and government of cities, towns and incorporated villages." A part is C. S., 2832, cited in the main opinion, and is subchapter 13, sec. 11. A full copy of the section is as follows: "Any city shall have the right

to acquire, establish, and operate waterworks, electric lighting systems, gas systems, schools, libraries, cemeteries, market houses, wharves, play or recreation grounds, athletic grounds, parks, abattoirs, slaughter houses, sewer systems, garbage and sewerage disposal plants, auditoriums or places of amusement or entertainment, and armories. Said city shall have the further right to make a civic survey of the city, establish hospitals, clinics, or dispensaries for the poor, and dispense milk for babies; shall have the power to establish a system of public charities and benevolence for the aid of the poor and destitute of the city; for the welfare of visitors from the country and elsewhere, to establish rest rooms, public water-closets and urinals, open sales places for the sale of produce, places for hitching and caring for animals and parking automobiles; and all reasonable appropriations made for the purposes above mentioned shall be binding obligations upon the city, subject to the provisions of the Constitution of the State."

The Legislature of North Carolina has given the municipal corporations of the State, C. S., 2832, *supra,* the power to acquire, establish, etc., *wharves.* The discretion is given to the municipal authorities, under C. S., 2791 (1917, ch. 136, subch. 4, sec. 1—1919, ch. 262), *"having and exercising or desiring to have and exercise the management and control of the streets . . . wharves." . . . The right to purchase and condemn for public use "on behalf and for the benefit of such city . . . either within or outside of the city."* 2791-2. *Berry v. Durham,* 186 N. C., p. 424. The Legislature made no provision for a vote of the people in regard to wharves, clearly indicating it was a necessary expense, recognizing at the same time the well known provision of the Constitution.

The Legislature has recognized the necessity of certain things that municipalities can acquire and among them *wharves* (terminal facilities). The will of the Legislature is the supreme law of the land, subject to the Constitution. To say the least, the fact that the Legislature having given the municipalities the power in its discretion to acquire by purchase or condemnation and management and control of *wharves,* is a legislative construction that wharves are a necessity. This declaration should have great persuasive influence on a court.

In *Sutton v. Phillips,* 116 N. C., 504, it is said: "While the courts have the power, and it is their duty, in proper cases to declare an act of the Legislature unconstitutional it is a well recognized principle that the courts will not declare that this coördinate branch of the government has exceeded the powers vested in it unless it is plainly and clearly the case. If there is any reasonable doubt it will be resolved in favor of the lawful exercise of their powers by the representatives of the people."

*S. v. Knight,* 169 N. C., 352; *Faison v. Comrs.,* 171 N. C., 415; *R. R. v. Cherokee Co.,* 177 N. C., 88; *R. R. v. Forbes,* 188 N. C., 155.

The purpose of the bond issue, as appears by the ordinance is: "Pursuant to the Municipal Finance Act, bonds of the city of Wilmington are hereby authorized to be issued in an aggregate principal amount not exceeding $100,000 for the purpose of paying the cost of constructing public municipal docks and terminals at or near the property known as the Old Liberty Shipyard, on the Cape Fear River, said public docks and terminals to be used for the purpose of shipping, both foreign and coastwise."

Black's Law Dictionary (2 ed.), p. 1226, defines wharf: "A perpendicular bank or mound of timber, or stone and earth, raised on the shore of a harbor, river, canal, etc., or extending some distance into the water, for the convenience of lading and unlading ships and other vessels. Webster: A broad, plain place near a river, canal, or other water, to lay wares on that are brought to or from the water. Cowell: A wharf is a structure erected on a shore below high-water mark, and sometimes extending into the channel, for the laying vessels alongside to load or unload, and on which stores are often erected for the reception of cargoes. *Doane v. Broad Street Ass'n,* 6 Mass., 332; *Langdon v. New York,* 93 N. Y., 151; *Dubuque v. Stout,* 32 Iowa, 47; *Geiger v. Filor,* 8 Fla., 332; *Palen v. Ocean City,* 64 N. J. Law, 669, 46 Atl., 774."

Black, *supra,* p. 385, defines Dock: "The space, in a river or harbor, inclosed between two wharves. *City of Boston v. Lecraw,* 17 How., 434, 15 L. Ed., 118; *Bingham v. Doanne,* 9 Ohio, 167. 'A dock is an artificial basin in connection with a harbor, used for the reception of vessels in the taking on or discharging of their cargoes, and provided with gates for preventing the rise and fall of the waters occasioned by the tides, and keeping a uniform level within the docks.' *Perry v. Haines,* 191 U. S., 17, 24 Sup. Ct., 8, 48 L. Ed., 73."

Webster defines terminal as an end, extremity, boundary or terminus; forming the terminus or extremity.

The word "wharves" in the State statute goes beyond being treated as synonymous with "docks and terminals"—wharves include "docks and terminals."

In *Hartsfield v. New Bern,* 186 N. C., p. 136, a unanimous Court gave the implied construction that under C. S., 2791-2, wharves were a necessity. The facts in that case—New Bern was founded and the colony first settled by de Graffenried and his followers on the land at the junction of the Trent and Neuse rivers—*Union Point.* This was the residence of the Indian King, Taylor, from whom de Graffenried bought it and erected the first Government House. This property was owned for generations by the city of New Bern and leased by it for 99 years, etc., but

on 13 January, 1923, the city paid the lessees $22,500, to cancel the lease, and held the property for wharves and terminals. It was necessary for the city to condemn certain property so that the Atlantic & N. C. Railroad Co., could extend its main track to the wharf at *Union Point,* deep water terminus, on Neuse and Trent rivers. The city contended (p. 138-9), "Its physical connection with the waterways and wharves at New Bern will not only benefit all of the people in Craven County, but all of the people in the State living in the territory wherein freight rates are based upon rail and water competition at New Bern. The physical connection and combined use of the rail and water transportation facilities was the very idea and hope of Murphey, Graham, Morehead, and other men who promoted internal improvements before the Civil War. The track of the Atlantic and North Carolina Railroad crosses Trent River at New Bern at an angle, and plaintiff's narrow strip of land adjoining is so situated that by extending their line to the channel of Trent River the railroad company may be deprived altogether of reasonable or adequate docking facilities, and the railroad company never has had anything more than a very narrow and inadequate dock and wharf until this track was constructed parallel with Trent and Neuse rivers and connecting with the *Union Point property, which is to be developed as a municipal wharf, as Wilmington, Norfolk, Baltimore, New York, and many other cities and towns on the water have developed municipal wharves as public necessities."* The plaintiff contended that the purpose was private and not public and his land could not be taken for private purpose for the railroads to make connection with Union Point wharves. The Court construes 2791-2, etc., *supra.* The Court says: "The act of the Legislature is presumed to be valid, and all doubts are resolved in its support, and it will not be held unconstitutional unless the conflict between the fundamental law and the legislation is manifest and without reasonable doubt. The condemnation in this case is for a public purpose, and it was within the power of the eminent domain under the provision of the statute above cited to take such property for public use in the manner stated. The operation of this side-track along the river fronts of the city of New Bern must be of great benefit to all shippers, manufacturers, merchants, and industries along the right of way. It is essential that the municipal docks and wharves shall be physically connected with the railroads of the country, and this track is the only means by which this can be done in the city of New Bern. . . . The lack of terminal facilities has doubtless prevented the public from enjoying the low freight rates prevailing where water transportation is obtained. To procure better freight rates has moved the people of that community to establish municipal wharves, but the wharves cannot be successfully maintained without railroad connection. . . .

(p. 144.) The enterprise thus undertaken was justified, and seems to have been *imperatively demanded by public necessity."* In the main opinion a narrow construction of "necessary expense" is sought for and adhered to. Taking a broad view, we find Collins in "Our Harbors and Inland Waterways" (1924), p. 6, says: "Several other Atlantic seaports have entered the race, notably Philadelphia, Baltimore, Norfolk and Charleston. In each case, these cities have felt the stimulus of the World War upon their trade, and are thoroughly awake to the possibilities of the future. They have engaged the services of experts to design improvements for their harbors, and are expending vast sums in deepening channels, *building docks and warehouses and equipping them with modern machinery, for handling cargoes.* Philadelphia, although far from the coast, has open navigation throughout the year. She stands at the center of a great manufacturing area, and has even more direct rail connections with the west than has New York. Baltimore and Norfolk enjoy wonderful harbor facilities and Charleston has probably the best natural harbor on the Atlantic seaboard after New York." Wilmington on the Cape Fear, with a splendid water front and a thirty-foot channel, is not mentioned. The city, until the present time, has done nothing.

The administration of the port of Philadelphia is under municipal control. The city owns about 20 piers. Baltimore is under municipal control. In its report issued March, 1922, it is estimated that it will expend on the port of Baltimore $10,000,000 a year for 10 years. The city of Norfolk owns three tracks with a water front 2,301 feet at Seawell's Point. It also owns several docks at street ends, suitable for launches and light craft vessels. The port administration of Charleston is vested in the municipality. The city has purchased terminal property from the railroads and the United States at a cost of $1,500,000 to be used as a public terminal. This includes a belt line railroad. Jacksonville is located 27.5 miles from the mouth of St. John's River. In 1913, the city authorized a bond issue of $1,500,000 for the construction of municipal docks. The city is engaged in carrying out very large improvements at this terminal. Pensacola, Flórida, owns 8,000 feet of frontage not developed, but a bond issue of $450,000 has been approved. Mobile, Ala., is in the southwestern part of Alabama, at the mouth of Mobile River, and the head of Mobile Bay. The Legislature of the State of Alabama recently authorized a $10,000,000 bond issue for the development of this port. The publicly owned terminals in existence at the present time are owned by the city of Mobile and consist of about 1,500 feet of wharfage, located on the west side of the river near the center of the business section and extending from Sauphin Street to State Street. This wharf is equipped with a shed and has rail connection.

The above applies to municipal owned terminals on the Atlantic and Gulf. All have municipal facilities except Wilmington. The State Terminals, such as New Orleans, La., the State and other interests have expended over $50,000,000 there. The State owns 18 covered wharves with an area of 2,450,000 square feet and 7 open wharves with an area of 620,000 square feet. An immense cotton terminal warehouse has been constructed as well as a public grain elevator.

Millions upon millions of dollars have been spent on State terminals at the following places: Houston, Texas; San Diego, Los Angeles, and San Francisco, Cal.; Portland, Ore.; Tacoma and Seattle, Wash.; Boston, Mass.; Providence, R. I., etc. States and cities are constructing public ports and facilities for shipping. One port—that of Portland, Ore.—has been built 113 miles from the sea; and Los Angeles, Cal., has gone 25 or 30 miles to the sea and built a port, and the port of Houston, Texas, is being built 50 miles from the gulf at an expense of more than thirty millions of dollars. If we expect to have our ports and waterways improved by the United States Government, we must have public terminals.

The United States law on this subject: "Every United Port should own its own water front, and this should be controlled by a port authority composed of the business men who have an excellent grasp of the export and import business and who are willing to devote sufficient time to the subject. These should be appointed without regard to political affiliations, and should take the broad view that the port is the property of the people at large, and that the provision of the best facilities will promote quicker ship dispatch, attract more ships, and thus enlarge the commerce of the port; that while the port terminal should be self-supporting, the charges should be adjusted to produce this result, without injury to business and that the growth of the port will mean the growth of the city and increased material prosperity to the individuals of the city and State. Those states which have only one man ports should in particular exert themselves to develop it along the most modern lines, and the first step in this direction is the appointment of a competent port authority." And further in the River and Harbor Act of 2 March, 1919, appears the following: "It is hereby declared to be the policy of Congress *that water terminals are essential to all cities and towns located upon harbors or navigable waterways, and that at least one public terminal should exist, constructed, owned and regulated by the municipality, or other public agency of the State,* and open to the use of all upon equal terms, and with the view of carrying out the policy to the fullest possible extent, the Secretary of War is hereby vested with the discretion to withhold, unless the public interest would seriously suffer by delay, moneys appropriated in this act for new projects adopted herein, or for the further

improvement of existing projects, if, in his opinion, no water terminals exist adequate for the traffic, and open to all on equal terms, or unless satisfactory assurances are received that local or other interests will provide such adequate terminal or terminals." What is the use of the United States Government expending millions of dollars on our channels and harbors if we allow them to remain unused? If we use them the United States Government will improve them. A city having a water-front, the water is practically a street for boats, as the streets are for vehicles.

It has been decided that the construction and repair of bridges and roads are necessary expenses. *Herring v. Dixon,* 122 N. C., 420; *Crocker v. Moore,* 140 N. C., 432; *Hendersonville v. Jordan,* 150 N. C., 35; *Comrs. Yancey v. Road Comrs.,* 165 N. C., 632; *Moose v. Comrs. Alexander,* 172 N. C., 419; *Woodall v. Highway Commission,* 176 N. C., 377; *Parvin v. Comrs. Beaufort,* 177 N. C., 508; *Guires v. Comrs. Caldwell,* 177 N. C., 516; *Davis v. Lenoir,* 178 N. C., 668.

Bridges and streets in a city are admittedly a necessary expense. They are primarily used for vehicles to go over to carry passengers and produce in and out of a city. A city that has a water front has to have wharves or terminals for water vehicles to load and unload passengers and produce brought in and carried out of the city. A wharf or terminal at the end of a street is practically a bridge, built by a municipality on a navigable stream, so that ships on a public highway can load and unload passengers and produce is, like a bridge or street, a necessary expense. The boats and ships—sea vehicles—load and unload on a wharf or terminal—a bridge as it were—over which produce is hauled to and from the street, and where passengers go to and from the city by water.

In the agreed case it states:

"Sec. 4. It is hereby determined that all expenses to be defrayed by means of the bonds hereby authorized are necessary expenses of the city of Wilmington, within the meaning of section 7, Art. VII, of the Constitution of North Carolina.

"Sec. 5. This ordinance shall be published once in each of the two successive weeks after final passage.

"Sec. 6. This ordinance shall take effect thirty days after its first publication, unless in the meantime a petition for its submission to the voters is filed under the Municipal Finance Act, and in such event it shall take effect when approved by the voters of the city of Wilmington, at an election as provided in said act."

No petition was filed to submit the ordinance to a vote of the people of the city, as provided in C. S., 2947. The plaintiff, a lone taxpayer,

brings this suit. Under the Finance Act he could have submitted the matter to a popular vote, but instead he brings this suit.

The writer of the main opinion in this case, in *Scales v. Winston-Salem,* 189 N. C., p. 470, says: "Difficulty is often encountered in drawing the distinction between these two branches of municipal activity, the one sometimes apparently impinging on the other. Without undertaking to lay down any definition which would be universal in its application, or to explain the apparent want and uniformity of some of the 'border-line cases,' we may say that in its public or governmental character a municipal corporation acts as an agency of the State for the better government of that portion of its people who reside within the municipality, while in its private character it exercises powers and privileges for its own corporate advantage. Its governmental powers are legislative and discretionary, and for injury resulting from a failure to exercise them, or from their negligent exercise, the municipality is exempt from liability; but it may be liable in damages for injury proximately caused by negligence in the exercise of its ministerial or absolute duties. In *Moffitt v. Asheville,* 103 N. C., 237, *Justice Avery* stated the principle as follows: 'When such municipal corporations are acting (within the purview of their authority) in their ministerial or corporate character in the management of property for their own benefit, or in the exercise of powers assumed voluntarily for their own advantage, they are impliedly liable for damage caused by the negligence of officers or agents, subject to their control, although they may be engaged in some work that will inure to the general benefit of the municipality. Shearman & Redfield Neg., secs. 123 and 126; Dillon on Mun. Corp., 966 and 968; Thompson on Neg., 734; *Meares v. Wilmington,* 31 N. C., 73; *Wright v. Wilmington,* 92 N. C., 156; Wharton Law of Neg., sec. 190, 10; Myers Federal Decisions, sec. 2327. The grading of streets, the cleansing of sewers and keeping in safe condition wharves, from which the corporation derives a profit, are corporate duties. Whitakers' Smith on Neg., 122; *Barnes v. District of Columbia,* 1 Otto, 540-557; *Treightman v. Washington,* 1 Black., 39; Wharton Neg., sec. 262."

In the above case it will be noted that a municipality "may be liable in damages for injury proximately caused by negligence in the exercise of its ministerial or absolute duties," then some of the absolute, corporate, duties are mentioned: (1) grading of streets; (2) cleansing of sewers (3) keeping in safe condition wharves, from which the corporation derives a profit. It is begging the question by saying "There are many," corporate duties "which are utterly remote from those relating to necessary expenses." The trouble here is that in the *Scales case* it was recognized by the writer of the main opinion that *wharves,* like *streets*

*and sewers,* were *absolute duties—corporate duties.* In the *Scales case* it is held that for injury resulting from the failure to exercise or negligent exercise of governmental powers the municipality is exempt from liability, but not so with absolute—corporate—duties; the city is liable, and wharves are a corporate duty—that is the *Scales case*—wharves therefore being a necessity and a "necessary expense" under Art. VII, sec. 7, of the Constitution.

The Constitution, Art. VII, sec. 7, does not require a vote of the people for "necessary expenses." It is said in the *Moffitt* and *Scales* opinions that the cities have certain absolute duties—corporate duties— to keep up streets, sewers and wharves. Why? Because they are necessary expenses.

I think the governing body of the city of Wilmington has the right to issue the $100,000 in bonds for the purpose of paying the cost of constructing public municipal docks and terminals or wharves. That from the facts and circumstances of this case it is a "necessary expense." *Persuasive consideration should be given* (1) to the governing body, the local authorities, of the city of Wilmington who have solemnly declared that the "bonds hereby authorized are necessary expenses of the city of Wilmington within the meaning of section 7, Art. VII, of the Constitution of N. C. (2) The city of Wilmington has purchased the land from the United States Shipping Board Emergency Fleet Corporation for $37,500 on condition that the city of Wilmington "maintain perpetually free port and terminal facilities." This contract was made 11 September, 1920, and expires in ten years. (3) The U. S. Government in the River and Harbor Act says: "It is hereby declared to be the policy of Congress that *water terminals are essential to all cities and towns located upon* harbors or navigable waterways. (4) It is admitted by the writer in the main opinion that there is no exact case in point. (5) The Legislature having given the power the court should be slow to construe that the Legislature did not have the power and declare the act unconstitutional. (6) In the *Hartsfield case, supra,* this Court in a unanimous opinion has practically said that wharves were a necessary expense. In the *Scales case, supra,* this Court by a unanimous opinion said keeping in safe condition wharves is a corporate (necessary) duty. (7) All the large cities on the Atlantic Coast have municipal wharves, terminals and docks. The sole exception is Wilmington. The consequence is that this progressive city, owning the land under a conditional deed from the U. S. Government, to create trade and wealth and give employment to all its citizens whereby it may become a greater municipality, has passed the act to issue bonds in the sum of $100,000—within the financial act limit—to build wharves and terminals on its land. It is a necessary expense for a farmer to plant seed-corn, just as it is a necessary expense

for Wilmington on the water-front of the Cape Fear River, to have
wharves, docks and terminals—not to have them would be such economy
as a farmer would use in not planting seed-corn. The hope of Murphey,
Graham and Morehead of the past, great constructive statesmen and the
same type of the present generation, was that such cities as Wilmington
with water front should have wharves and terminals to stimulate and
encourage those that travel the ocean highways to come to the seaport,
like the state and county highways, so that produce can be shipped
anywhere, and especially to and from South America and the West
Indian Islands, without first going through Northern ports. The munici-
pality is attempting to do this. The Legislature has given it the power.
Courts do not make, but construe, the law. Courts have no right to
arbitrarily declare an act unconstitutional.

I think the purpose a "necessary expense" and the action of the gov-
erning body of the city of Wilmington should be upheld.